**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TRACY JONES, on behalf of himself and all others similarly situated,** | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 09 C 1538 |
| **CORUS BANKSHARES, INC., ROBERT J. GLICKMAN, and TIM H. TAYLOR,** | ) ) ) | |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Todd L. Johnson brings this securities fraud class action against defendants Corus Bankshares, Inc. ("Corus"), Corus's Chief Executive Officer, Robert J. Glickman ("Glickman"), and Corus's Chief Financial Officer, Tim H. Taylor ("Taylor"), for violating sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), as well as SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The suit is brought on behalf of all purchasers of Corus's common stock between January 25, 2008 and January 30, 2009. During that period, plaintiff claims that Corus made numerous false and misleading statements about its lending practices, capital position, and loan loss reserves, and that these statements artificially inflated the price of Corus common stock.

Corus moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that

plaintiff has failed to meet the pleading requirements of Federal Rule 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("PSLRA").  For the reasons discussed below, the motion is granted in part and denied in part.

## I.   Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint, not its merits.  *See, e.g.*, *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In resolving a Rule 12(b)(6) motion, all well-pleaded allegations in the complaint are taken as true, and all reasonable inferences are drawn in favor of the nonmoving party.  *See, e.g.*, *McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 758 (7th Cir. 2006). Dismissal is warranted under Rule 12(b)(6) only where the plaintiff can prove no set of facts in support of his claims that would entitle him to relief.  *See, e.g.*, *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 726 (7th Cir. 1998).

Since plaintiff alleges fraud under section 10(b), his complaint is subject to the heightened pleading requirements of Federal Rule 9(b).  *Last Atlantis Capital LLC v. AGS Specialist Partners*, 533 F. Supp. 2d 828, 830 (N.D. Ill. 2008).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  As the Seventh Circuit has put it, Rule 9(b) requires a party to allege "the who, what, when,

-2-

where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Claims asserted under the Exchange Act are also subject to the pleading requirements of the PSLRA.  Under the PSLRA, a private securities complaint alleging a false or misleading statement must: "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (quotation marks omitted).  Thus, summarizing the inquiry that must be undertaken in deciding a Rule 12(b)(6) motion to dismiss a section 10(b) claim, the Supreme Court has explained:

> *First*, faced with a Rule 12(b)(6) motion to dismiss a §
> 10(b) action, courts must, as with any motion to dismiss
> for failure to plead a claim on which relief can be
> granted, accept all factual allegations in the complaint
> as true . . . .  *Second*, courts must consider the
> complaint in its entirety, as well as other sources
> courts ordinarily examine when ruling on Rule 12(b)(6)
> motions to dismiss, in particular, documents incorporated
> into the complaint by reference, and matters of which a
> court may take judicial notice.  The inquiry, as several
> Courts of Appeals have recognized, is whether *all* of the
> facts alleged, taken collectively, give rise to a strong
> inference of scienter, not whether any individual
> allegation, scrutinized in isolation, meets that standard
> . . . .  *Third*, in determining whether the pleaded facts
> give rise to a "strong" inference of scienter, the court
> must take into account plausible opposing inferences . .
> . . [T]he inference of scienter must be more than merely
> "reasonable" or "permissible" -- it must be cogent and
> compelling, thus strong in light of other explanations.
> A complaint will survive, we hold, only if a reasonable
> person would deem the inference of scienter cogent and at

least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 322-24 (citations omitted).

With these principles in mind, I now turn to a consideration of Corus's motion to dismiss plaintiff's complaint.

## II.   Discussion

Plaintiff's complaint alleges that Corus violated section 10(b) of the Exchange Act, which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Section 10(b) is implemented by SEC Rule 10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Thus, "[i]n order to state a claim for a private cause of action under Rule 10b-5, a plaintiff must allege: (1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and that the false statement proximately caused the plaintiff's damages." *Tricont'l Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 842 (7th Cir. 2007) (quotation marks omitted).

Plaintiff contends that Corus made several false or misleading statements throughout the class period. Broadly speaking, the complaint alleges that Corus misrepresented the nature and extent of its financial troubles and its ability to survive the downturn affecting the economy at the time. In particular, plaintiff cites Corus's statement that it would continue to originate a "significant number" of new loans with "very good . . . credit quality" in 2008, Compl. ¶ 8; that Corus "continued to have a strong capital position," *id.* ¶ 10, and would be able to "absorb any losses," *id.* ¶¶ 29, 34, 42; that Corus's collateral would maintain its value, and that its loans were "conservatively underwritten," *id.* ¶¶ 11, 34; and that Corus's "loan loss reserves [we]re adequate" and "estimated in accordance with . . . GAAP," *id.* ¶¶ 42, 44. In addition, plaintiff points to Glickman's characterization of Corus's balance sheet as "fortress-like," *id.*

-5-

¶¶ 6, 16, 41, and his statement that Corus possessed "strong liquidity" during the period in question, *id.* ¶¶ 41, 42. Plaintiff seeks to hold Corus, Glickman, and Taylor liable for these allegedly fraudulent statements. In what follows, I consider plaintiff's claims against each of the defendants separately.

**A. Corus**

I first examine plaintiff's claims against Corus. Corus argues that the complaint must be dismissed for two reasons: first, because the statements on which plaintiff's fraud claims are based are not false or misleading; and second, because plaintiff has failed to adequately allege that Corus's statements were made with scienter. I am not persuaded on either point.

**1. Statements Regarding Corus's Reserves**

Corus first contends that plaintiff's complaint fails because none of the statements identified in the complaint is false or misleading. In making this argument, Corus divides the statements in question into two groups: (1) those pertaining to the alleged adequacy of its reserves; and (2) those regarding other aspects of Corus's business. Here, I consider Corus's arguments with respect to the first class of statements; in the next section, I discuss Corus's arguments concerning the second class.

Corus begins by arguing that the complaint fails to allege particularized facts to support his claim that Corus failed to adequately increase its reserves for credit losses during the class

-6-

period.   According   to   Corus,   this   effectively   eviscerates
plaintiff's suit, because if Corus's reserves were not deficient,
there is no reason to think that any of its statements about the
adequacy of its reserves was false; and if Corus's statements about
its reserves were not false, they plainly cannot form the basis for
a fraud action.

Corus's argument goes wrong from the outset by attempting to
assimilate plaintiff's suit here to the suit at issue in *DiLeo v.
Ernst & Young*, 901 F.2d 624 (7th Cir. 1990).   There, purchasers of
Continental   Illinois   Bank's   securities   filed   suit   against   the
bank's outside auditor, Ernst & Young.   The complaint alleged that
Continental had failed to increase its reserves quickly enough and
that before the plaintiffs purchased their stock, Ernst & Young
"became aware that a substantial amount of the receivables reported
in   Continental's   financial   statements   were   likely   to   be
uncollectible."   *Id.* at 626 (quotation marks omitted).   The Seventh
Circuit upheld the case's dismissal, holding that the plaintiffs
had failed to allege fraud with sufficient specificity.   Writing
for the court, Judge Easterbrook explained:

> Investors   seeking   relief   under   Rule   10b-5   have   to
> distinguish their situation from that of many others who
> are   adversely   affected   by   business   reverses.    This
> complaint fails to do so. You cannot tell from reading it
> why the DiLeos believe that the problems were so apparent
> that reserves should have been jacked up before the end
> of 1983 -- why failure to increase the reserves amounted
> to "fraud".
>
> . . . .

> The story in this complaint is familiar in securities
> litigation.  At one time the firm bathes itself in a
> favorable light.  Later the firm discloses that things
> are less rosy.  The plaintiff contends that the
> difference must be attributable to fraud.  "Must be" is
> the critical phrase, for the complaint offers no
> information other than the differences between the two
> statements of the firm's condition.  Because only a
> fraction of financial deteriorations reflects fraud,
> plaintiffs may not proffer the different financial
> statements and rest.  Investors must point to some facts
> suggesting that the difference is attributable to fraud.
> That ingredient is missing in the DiLeos' complaint.  It
> presents nothing other than the change in the stated
> condition of the firm to suggest that E & W was so much
> as negligent in auditing Continental's financial
> statements.  Rule 9(b) required the district court to
> dismiss the complaint, which discloses none of the
> circumstances that might separate fraud from the benefit
> of hindsight.  There is no "fraud by hindsight", in Judge
> Friendly's felicitous phrase, and hindsight is all the
> DiLeos offer.

*Id.* at 627-28 (citations omitted).

Corus argues that plaintiff's complaint here, like the complaint in *DiLeo*, is based on a "fraud-by-hindsight" theory. According to Corus, plaintiff simply "point[s] to Corus' losses in the fourth quarter of 2008, after the country had plunged into the worst recession since the Great Depression, and mak[es] the wholly illogical claim that defendants must have known all along that Corus was going to suffer losses of that magnitude."  Reply at 4. As a result, Corus maintains that under *DiLeo*, the complaint's allegations that Corus was under-reserved are inadequate.

I disagree.  Unlike the plaintiff in *DiLeo*, plaintiff here has alleged specific, concrete reasons for his contention that Corus should have known that its reserves were inadequate and needed to

be increased, and that Corus's statements about the adequacy of its reserves were misleading.  In *DiLeo*, the complaint's most specific allegations were the following:

> (i) At Annual Report page 22, provisions for credit losses were stated at $492 million, which failed to reflect the material amounts of credits for which reserves should have been taken, in additional amounts of at least $600 million.
>
> (ii) At page 22, net credit losses of $393.2 million were materially understated by approximately $4 billion in bad loans.
>
> (iii) At page 22, non-performing loans were reported at approximately $1.9 billion which materially understated the amount of loans which were not performing or which had been restructured to give the illusion that they were currently meeting obligations . . . .

*Id.* at 626-27.  These allegations merely assert that Continental's financial troubles were understated.  They do not explain why it should have been clear to Ernst & Young at the time that Continental was under-reserved.

Here, by contrast, the complaint alleges numerous facts indicating that Corus should have known *ex ante* that the level of its reserves was insufficient.  For example, plaintiff alleges that Corus's construction loan portfolio -- which makes up 85% of Corus's loans -- was already showing signs of problems by mid-2006. He also alleges that by the end of 2007, construction costs had become astronomically high and construction on many Corus-funded projects had fallen behind schedule.  *Id.*  Moreover, plaintiff claims that "[a]s of December 31, 2007, Corus' noncurrent condo

-9-

loans nearly quadrupled from a year earlier to $282.8 million," and that, despite this fact, "Corus had reserved only approximately $71 million (25% the value of all noncurrent loans) – much less than the 42% of noncurrent loans set aside in 2006 during the robust market." *Id.* at 6.  Still further, the complaint alleges that by "January 2008, an astonishing $3.96 billion of Corus' loans -- about 90% of the Company's loans outstanding -- were due for maturity or re-pricing by early to mid-2008," which meant that "thousands of condo units planned during the robust housing years were due to enter a glutted market amid buyer cancellations, declining property values and a gridlocked mortgage market."[1]

---

[1]To be sure, Corus attempts to rebut plaintiff's allegations. For example, Corus takes issue with the statement that "$3.96 billion of Corus' loans . . . were due for maturity *or* re-pricing by early to mid-2008." Reply at 9. According to Corus, "virtually all of its condominium construction loans were variable rate loans, which generally were 're-priced' every quarter," so that "it was to be expected that virtually all of Corus' loan balances would either mature or be repriced within any given three-month period." Defs.' Mem. at 16.  Corus objects that the complaint "does not say what the break-down was between loans that were merely re-pricing and those that were 'maturing,'" and that in the absence of such a breakdown, "there is no basis for assuming that there was any extraordinary number of condos coming onto the market." *Id.*  Even assuming Corus is correct, however, plaintiff alleges additional facts to support the claim that an unusually large number of condos would be entering the market during the class period.  For example, the complaint quotes Michael Stein, Corus's Executive Vice President of Commercial Lending, as stating in a "January 1, 2008 article that '[2008] is going to be an interesting year because a lot of projects are going to be delivered to the market . . . . If developers sell only 5% or 10% [of their units], then it will be a disaster . . . . If they sell half, there will be a lot of pain . . . .'" Compl. ¶ 5 (emphasis omitted).  Corus seeks to downplay the significance of the statement by claiming that Stein was speaking of the industry generally and not about Corus's business

Compl. ¶ 56.  These allegations set forth in very clear and specific terms the information available to Corus and why, given its possession of this information, Corus's statements about the adequacy of its reserves were misleading.  In short, plaintiff has not asserted "fraud by hindsight."

Still relying on *DiLeo*, however, Corus claims that plaintiff's complaint is deficient because he "does not point to a single concrete example of a loan that Corus supposedly should have treated differently."  Defs.' Mem. Supp. Mot. Dismiss at 14 ("Defs.' Mem.") (quotation marks omitted).  Similarly, Corus complains that while plaintiff "asserts that defendants were not properly evaluating collateral values . . . he does not identify any specific valuations that were supposedly too high."  *Id.* However, *DiLeo* did not hold that all plaintiffs in private

---

in particular.  *See* Reply at 9.  But since Corus is part of the industry that Stein was describing, his statements about the industry generally would be applicable to Corus in particular.  And given that Stein was a Corus VP, it is entirely reasonable to infer that his comments were informed by his knowledge of Corus's own woes.  Thus, plaintiff's claim that the condo market would be flooded during the class period -- and thus its claim that Corus should have been aware that a potential crisis lay ahead -- is adequately supported when the complaint's allegations about the maturity of Corus's loans are taken in concert with its other allegations concerning, for example, statements by Corus officials.

Although I do not delve into the minutiae of each of the arguments advanced in Corus's briefs, I have given the arguments careful consideration.  To the extent that I have omitted discussion of any of these arguments, I have done so for the sake of concision.

securities actions must identify particular examples of bad loans in order to allege a corporation's misrepresentation of the adequacy of its reserves. *DiLeo* merely indicated that citing specific examples of bad loans was one possible way of pleading fraud with the requisite particularity. *DiLeo's* fundamental point is simply that a complaint in a securities fraud action must contain specific allegations of some kind that point to fraud on the defendants' part, as opposed, say, to poor management or simple misfortune. As explained above, plaintiff's complaint meets this burden.

### 2.   Corus's Other Statements

In addition to its statements about the adequacy of its reserves, plaintiff claims that Corus made misleading statements about other aspects of its financial condition. For example, the complaint alleges that Corus made misleading statements about its ability to originate new loans during the class period. Specifically, plaintiff points to Corus's announcement that it anticipated "a significant amount of originations in the first quarter of 2008." Compl. ¶ 18. According to plaintiff, Corus was aware when it made these statements that they were incongruent with conditions looming on its horizon. Indeed, the complaint alleges that as late as August 2008, Corus told investors that it "expect[ed] originations to remain reasonably strong during the rest of the year," despite the fact that Corus had already stopped

originating loans.  Resp. at 10; Compl. ¶¶ 44, 50.

Corus challenges plaintiff's basis for the latter claim, arguing that at the time it is alleged to have made the statement, Corus simply could not have known that it had stopped originating new loans.  But for purposes of a Rule 12(b)(6) motion to dismiss, plaintiff is not required to prove the truth of his allegations, and it would be inappropriate to weigh the parties' factual bases for their respective positions.  *Tellabs*, 551 U.S. at 322; *see also Twombly*, 550 U.S. at 563 n.8 ("[When a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations."); *Knowles v. Hopson*, No. 07-CV-6131, 2008 WL 2414849, at *2 (N.D. Ill. June 12, 2008) ("Read together, Rule 9(b) and Rule 8 require that the complaint include the time, place and contents of the alleged fraud, but the complainant need not plead evidence.").  Thus, in addition to Corus's statements concerning the adequacy of its reserves, plaintiff has adequately alleged fraud on the basis of Corus's statements about other aspects of its financial condition.

### 3.  Scienter

Corus next argues that plaintiff has failed adequately to plead scienter.  Scienter is defined as "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false."

-13-

*Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). As noted above, the PSLRA requires a plaintiff to plead facts that "give rise to a 'strong' inference of scienter," meaning that "the inference of scienter must be more than merely 'reasonable' or 'permissible' [but instead] must be cogent and compelling." *Tellabs,* 551 U.S. at 321 (quotation marks omitted).

Plaintiff's complaint contains many allegations that, at least when taken collectively, support a strong inference that the statements in question were made with scienter. An inference of scienter is supported, first of all, by Corus's awareness of the discrepancy between its public statements about its finances and the corporation's true final condition. As already noted, for example, the complaint alleges that Corus stated that loan originations would remain "reasonably strong" in the future, even though it knew by that time that it had stopped originating new loans. Resp. at 10; Compl. ¶¶ 44, 50.

The inference that Corus acted with scienter is further buttressed by many other allegations in the complaint. For example, plaintiff points to Corus's creation of undisclosed Special Purpose Entities ("SPEs") as evidence of scienter. Corus used these entities in order to take control of certain of its distressed properties. According to plaintiff, this is evidence "that defendants **knew** and **expected** a significant (and undisclosed) amount of loans to fail during the class period." Resp. at 20.

-14-

Corus seeks to downplay the significance of these allegations by claiming that the creation of SPEs in itself is not unusual, and that in this case, Corus "disclosed each quarter the number of properties on which it had initiated or intended to initiate foreclosure proceedings." Defs.' Mem. at 18. But this response fails to address plaintiff's allegation that the SPEs were *undisclosed* to investors, which betokens an intent to deceive. Corus may ultimately prove correct in insisting that the creation of SPEs in this case was entirely innocuous. That issue is a factual one, however, and cannot be resolved at the pleading stage.

Corus also challenges plaintiff's allegations regarding the SPEs on the ground that the complaint fails to state precisely when during the class period the entities were created. According to Corus, plaintiff's "theory falls apart if the SPEs were created in the last quarter of 2008, when Corus' 2008 foreclosures occurred and when it warned investors to expect additional foreclosures." Reply at 12. In other words, Corus contends that disclosing information about the SPEs would not have made any difference to investors in the final quarter of 2008, because by that time they would already have known that Corus's financial position was worsening. But strictly speaking, this argument does not follow: even if Corus had warned investors that additional foreclosures were in the offing, it might nonetheless have attempted to misrepresent the true extent of Corus's hardship by surreptitiously

-15-

creating the SPEs.[2]

---

[2] As additional evidence of scienter, plaintiff cites what he characterizes as "sham purchases" made by Corus. Specifically, plaintiff alleges that "on November 24, 2008, defendants began purchasing their own collateral to create an illusion of successful sales and inflate collateral appraisal values." Resp. at 20. "In addition to raising a strong (almost irrefutable) inference of scienter," plaintiff claims, "defendants are liable for failing to disclose these sham purchases to investors during the class period." *Id*.

Corus correctly objects that these allegations in particular do not support a strong inference of scienter. This is because the sham purchases are alleged to have taken place *after* plaintiff's last purchase of Corus stock. It is well-settled in this Circuit that "post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992); *Zerger v. Midway Games, Inc.*, No. 07 C 3797, 2009 WL 3380653, at *4 n.1 (N.D. Ill. Oct. 19, 2009) (collecting cases).

Plaintiff attempts to recast Corus's argument as a claim that he lacks standing to serve as the class representative for the litigation. In particular, he cites *Danis v. USN Communications, Inc.*, 189 F.R.D. 391 (N.D. Ill. 1999), for the proposition that a named plaintiff does not lose standing to bring a class action suit simply because some of the fraudulent statements at issue in the litigation were made after he made his last stock purchase. In *Dannis*, the court held that if "'the rule [were] otherwise, there could never be a class action in securities fraud cases because a representative plaintiff would potentially be needed for each day of the class period, since on each day the mix of information available to the public would vary.'" *Id.* at 399 (quoting *Feldman v. Motorola, Inc.*, 1993 WL 497228, Fed. Sec. L. Rep. (CCH), ¶ 97,806 (N.D. Ill. Oct. 14, 1993)). In *Dannis*, however, there were two class periods -- one prior to the initial public offering, and one after -- and there were two named plaintiffs -- Karr and Priesmeyer. The court merely held that "[t]aken together, Karr and Priesmeyer have standing as to all claims asserted: Karr over claims arising from aftermarket purchases, and Priesmeyer over claims arising from initial public offering purchases." *Id.*

The issue is not of critical significance, however, for even without the allegations concerning the sham purchases, plaintiff's complaint sufficiently alleges scienter.

As further support for his scienter allegations, plaintiff points to changes that Corus made to its commissions policy during the class period.   Under the original policy, part of a loan officer's commission was withheld so that if Corus were to suffer a loss on a loan, the officer would lose a portion of his or her commission.   According to plaintiff, this feature of the policy created an incentive for officers to avoid making risky loans.   In January 2008, however, Corus eliminated its so-called "holdback" policy, so that loan officers would now receive their full commission regardless of whether Corus incurred losses on the loan. The complaint alleges that the change was adopted as part of an attempt to encourage loan officers to make more loans without regard to risk.   Plaintiff argues that Corus knew that many of the loans made under the new policy would result in default, but that Corus made the loans anyway in an effort to save appearances and to promote an inflated picture of its lending activity.   Compl. ¶ 56(h).

Corus argues that the latter allegations are too speculative to comport with the PSLRA's requirements.   Defs.' Mem. at 25.   I disagree.   It might be true that, taken in isolation, Corus's abandonment of the holdback policy would not give rise to a strong inference of scienter.   As the Supreme Court has instructed, however, "[t]he inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter,

not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  When all of plaintiff's other scienter allegations are factored into the equation, the dropping of the holdback policy further strengthens the inference of scienter.

Corus offers several additional arguments in an attempt to undermine plaintiff's scienter allegations, but these, too, are unpersuasive.  Thus, Corus maintains that plaintiff's claims of scienter are belied by the fact that plaintiff "himself does not question the integrity of any other financial results Corus disclosed during the purported class period."  Defs.' Mem. at 18. According to Corus, "plaintiff does not allege that Corus was over-reporting income, fudging on non-accrual loans, or otherwise manipulating its financial statements.  Nor does plaintiff question the methodology Corus used to establish its reserves."  *Id.* at 18.

Here, Corus is simply mistaken.  In point of fact, plaintiff unequivocally challenges Corus's methodology in recording its reserves, overstating its earnings, and, when taken with the complaint's other allegations, of manipulating its publicly-issued financial statements.  For example, the complaint alleges:

> Corus' publicly issued financial statements and related
> earnings releases during the Class Period were materially
> misstated in violation of Generally Accepted Accounting
> Principles ("GAAP") and Securities and Exchange
> Commission ("SEC") rules because defendants failed to
> record adequate and timely loan loss reserves and misled
> investors as to the significant loss exposure Corus faced
> related to the Company's loan portfolio.  As a result,

-18-

> Corus' reported net loans, pre-tax income and earnings
> per share ("EPS") were materially overstated and its
> provision for credit losses was understated at each
> quarter during the Class Period.

Compl. ¶ 15; see also Resp. at 12 n.5.  Moreover, even if it were

true that the complaint contained no allegation that Corus had

manipulated its financial statements, that would not refute an

inference of scienter.

Similarly, Corus insists that plaintiff "has not pointed to

any 'red flags' that would have alerted defendants that Corus'

allowance for credit losses was too small.  Defs.' Mem. at 18.

Specifically, Corus argues:

> In ¶ 66, plaintiff lists a number of facts that he
> characterizes as "red flags."  But in so doing plaintiff
> simply repeats publicly available information about the
> increasing difficulties in the housing market and the
> declining state of Corus' loan portfolio.  Corus
> expressly recognized these developments in its periodic
> disclosures and took larger and larger provisions each
> quarter to address them.  What plaintiff has failed to do
> is to offer any reason why the defendants should have
> realized, in any quarter, that the provisions it had
> taken were inadequate.

Defs.' Mem. at 18.

Here, too, Corus's account of the complaint is incorrect.  On

the contrary, plaintiff clearly singles out several "red flags" in

his complaint.   These include: "(i) significant increases in

defaults, foreclosures and non-current loans; (ii) significant

exposure to deteriorating condo markets; (iii) plummeting

collateral values; (iv) increasing numbers of uncompleted projects;

and (v) dire sales levels."  Resp. at 11-12.

-19-

Next, Corus contends that any inference of scienter is undermined by the frankness of some of its public statements during the class period.  For example, Corus claims that it "candidly discussed the difficulties it was facing, suspended its dividend, and then declared its first ever loss in the second quarter of 2008 all militate against any inference that defendants were deliberately or recklessly understating Corus's quarterly provisions for loan losses."  Defs.' Mem. at 18.  According to Corus, if it had intended to deceive the public about the value of its stock, it would have made no sense for Corus to disclose its difficulties so openly.

This argument is not without force, but it does not carry the day.  Plaintiff does not contend that Corus sought to pull the wool over the public's eyes by claiming that it would pass through the recession entirely unscathed.  Instead, according to plaintiff, Corus's fraud consisted largely in concealing the full extent of its financial difficulties.  Thus, the fact that Corus disclosed certain of its difficulties during the class period does not necessarily negate an inference of scienter, for Corus's statements may still have been intended to conceal the fact that its condition was substantially worse than its statements suggested.  *Cf. In re Neopharm, Inc. Sec. Litig.*, No. 02 C 2976, 2003 WL 262369 (N.D. Ill. Feb. 7, 2003) (even though corporation acknowledged potentially bad economic consequences due to delays in testing of

its new drug, statements were still actionable because the defendant may have "downplayed the significance of the . . . delay by not disclosing the serious extent and nature of the problems plaguing [the drug]").

Lastly, Corus argues that any inference of scienter is refuted by the fact that Glickman and other corporate insiders made no attempt to sell their Corus stock during the class period. According to Corus, this fact is irreconcilable with the notion that Glickman knew Corus's stock was overvalued. I am not persuaded. The fact that Glickman did not sell his Corus stock may militate against an inference of scienter, but it is by no means decisive.[3]  *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class

_____

[3] Corus believes that I may take judicial notice of the fact that Glickman did not sell Corus stock during the period in question. It is not at all clear that this is so. Corus cites two district court cases from the Ninth Circuit in support of its position, but it points to no case in this Circuit. *Riggs Partners, LLC. v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721 (N.D. Ill. Oct. 25, 2002), is the only case I have found in which a district court was asked to take judicial notice of stock purchases, and there, Judge Gettleman declined to do so. *Id.* at *1 n.6. Moreover, to the extent that the Seventh Circuit has allowed judicial notice of documents such as SEC filings generally, it has done so for purposes other than establishing the truth of the matter in question. *See, e.g.*, *George v. Kraft Foods Global, Inc.*, --- F. Supp. 2d ---- (N.D. Ill. 2009). Nevertheless, plaintiff does not dispute Corus's assertions on this point; and even assuming that Glickman did not sell Corus stock during the class period, Corus's argument falters.

period."); *see also PR Diamonds, Inc. v. Chandler*, 91 Fed. App'x. 418, 436 (6th Cir. 2004) ("[W]e have never held that the absence of insider trading defeats an inference of scienter."). Nor is the lack of trading activity decisive when taken together with Corus's other arguments against scienter. It must be recalled that at this stage, plaintiff is not required to conclusively prove the existence of scienter. It is necessary only that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Plaintiff's complaint passes this test.

In short, plaintiff has sufficiently alleged that Corus's statements were false and/or misleading and that the statements were made with scienter. As a result, I deny the motion to dismiss plaintiff's claims against Corus.

## B. Glickman

Corus next focuses on the complaint's allegations with respect to Glickman. Corus contends that Glickman must be dismissed from the suit for essentially two reasons: first, because the statements attributed to Glickman are not actionable; and second, because plaintiff has failed to adequately allege scienter on Glickman's part. Once again, I am not convinced on either point.

### 1. Whether Glickman's Statements Are Actionable

Corus's arguments center on four statements in particular: (1)

-22-

Glickman's repeated expressions of confidence in Corus's ability to absorb its losses and to "weather the storm"; and (2) his assertion that Corus possessed a "strong capital position," (3) possessed "strong liquidity," and (4) a "fortress-like balance sheet."[4]

Corus offers several reasons why Glickman's statements are not actionable.  For example, Corus maintains that the statements "were so hedged around with qualifications and warnings that bespoke caution that no reasonable investor would have relied on them." Reply at 17.  "Against that background," Corus argues, Glickman's characterizations of its balance sheet and his "predictions about its ability to survive the storm would pale into insignificance." Reply at 18.  I am not convinced.  When taken in context and viewed as a whole, Glickman's cautionary statements simply are not so predominant that it would have been unreasonable for an investor to rely on Glickman's more upbeat and encouraging remarks.

---

[4] Some of Corus's arguments concerning these allegations are recapitulations of those already considered above.  For example, Corus argues that plaintiff has failed to allege any facts suggesting that Glickman's statements were false or misleading, because, according to Corus, plaintiff has given no reason for doubting that Corus's capital position and liquidity were indeed strong or that its balance sheet was indeed "fortress-like."  This argument is identical in substance to Corus's argument that its statements about the adequacy of its reserves were not misleading because its reserves were in fact adequate throughout the class period.  As already explained, plaintiff has adequately alleged that Corus's financial condition was significantly weaker than its public statements would have indicated and that Corus's statements were therefore misleading.  The same analysis applies *mutatis mutandis* with respect to Glickman's statements regarding the strength of Corus's liquidity and capital position.  Accordingly, I shall not repeat that analysis here.

Similarly, Corus contends that Glickman's statements are not actionable because they are mere expressions of opinion and hope. However, a statement is not "protected from the securities laws merely because it speaks to matters of opinion and hope." *Lindelow v. Hill,* No. 00 C 3727, 2001 WL 830956, at *4 (N.D. Ill. July 20, 2001) (citations and quotation marks omitted). On the contrary, as one court has explained:

> In some circumstances, statements of goals can, in context, be read by the investor to imply that the company had a reasonable basis for its opinion. [S]tatements of opinion will be actionable if it is possible defendants said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth ex ante. Plaintiffs have alleged that defendants made many of the alleged statements of "strategy" and "goals" while knowing or recklessly ignoring the fact that the stated goals were not attainable. Those allegations are sufficient to state a claim that defendants made false and misleading statements.

*Id*; *see also Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1417 (7th Cir. 1992) (declining to hold that defendants' forward-looking statements were "immaterial as a matter of law merely because they 'bespoke caution,'" since even though "defendants' alleged statements were contingent by their very nature, a reasonable investor could have taken them to imply that defendants' had a reasonable basis for stating that [its] goal was attainable").

Viewing the allegations in the complaint in the light most favorable to plaintiff, Glickman's statements about the fortress-

like character of Corus's balance sheet, or Corus's strong
liquidity and strong capital position, could be considered so
"discordant with reality that they [might have induced] a
reasonable investor to buy the stock" at an artificially high
price.

A somewhat closer question is presented by Corus's argument
that Glickman's statements are not actionable because they amount
to mere puffery.  As Corus puts it, Glickman's are the kind of
"loosely optimistic statements that are so vague, so lacking in
specificity, or so clearly constituting the opinions of the
speaker, that no reasonable investor could find them important to
the total mix of information available." Defs.' Mem. at 21.  It is
true that courts have often deemed statements such as those in
question here to be puffery. *See, e.g.*, *Phoenix Payment Solutions,
Inc. v. Towner*, No. CV-08-651-PHX-DGC, 2009 WL 3241788, at *6 (D.
Ariz. Oct. 2, 2009) (statement that company was "financially
strong" was not objectively quantifiable but instead was a vague
and optimistic assertion regarding the company's overall financial
condition and therefore amounted to puffery); *Magruder v.
Halliburton Co.*, No. 3:05-CV-1156-M, 2009 WL 854656, at *18 (N.D.
Tex. Mar. 31, 2009) (statements that Halliburton had a strong
investment rating and balance sheet, and that Halliburton was a
"conservatively financed company with substantial resources"
constituted puffery); *In re Splash Tech. Holdings, Inc. Sec.*

-25-

*Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (statements which used the words "healthy", "strong", or "increased awareness" constituted vague assessments of past results, on which no reasonable investor would rely and thus were not actionable).

At the same time, courts have stressed that context must be taken into account in determining whether a given statement or set of statements qualifies as puffery. *See, e.g.*, *F.T.C. v. Trudeau*, 579 F.3d 754, 766 (7th Cir. 2009) ("In determining whether a statement is puffery, the context matters.") (citing *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106 (10th Cir. 2009)). As the Seventh Circuit has explained:

> [W]e note initially that materiality depends upon the facts. It is necessary to examine the significance the reasonable investor would place on the withheld or misrepresented information . . . . [T]here must be a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact. The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company. If the statement amounts to vague aspiration or unspecific puffery, it is not material.

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) (citations and quotation marks omitted). Thus, in *Makor,* the court concluded that the defendant's statement that its product was "still going strong" could not be deemed puffery. The court's determination was based in key part on the fact that the statement appeared in the "frequently asked questions" section of

the company's Annual Report.

Moreover, even where a statement is not actionable when considered individually, it can be actionable if it "reinforce[s] factual misstatements and therefore contribute[s] to ongoing deception." *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 726 (N.D. Ill. 2003) (quotation marks omitted). Similarly, statements that would otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true" could not be deemed puffery); *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (statements regarding Motorola's "strong balance sheet, that Motorola was "upbeat," "confident" were puffery, but statements that the "competitive" products are "on track," "quite on track," or "keyed up," would be material if in fact defendants knew that those products were not on track).

In light of these considerations, I decline at this stage of the litigation to hold that Glickman's statements are puffery. Glickman's claim that Corus's balance-sheet was "fortress-like" might seem too vague and metaphorical to be actionable. When the surrounding context is taken into account, however, the matter is less clear. It is worth noting, for example, that the statement

-27-

was used not only in a press release, *see* Compl. ¶¶ 41, 42 (citing press releases from May and July 2008), but also in a SEC Form 10-Q, ¶ 44 (citing Corus's Second Quarter 2008 Form 10-Q); *see also Blatt v. Corn Products Intern., Inc.*, No. 05 C 3033, 2006 WL 1697013, at *4 (N.D. Ill. June 14, 2006) ("Defendants statements were also made in the context of discussing specific factors that might affect profits and operating margins, such as higher energy costs and price increases in the low, single-digit range. This context tends to show that Defendants' statements were not simple expressions of optimism but reasoned predictions of the future.").

Moreover, Glickman's statements can be viewed as supporting certain of Corus's other alleged misrepresentations. For example, Glickman's claims about Corus's "fortress-like" balance sheet or about its "strong liquidity" might be viewed as reinforcing other alleged misleading statements, such as those about Corus's ability to originate new loans, or about Corus's financial health generally. Insofar as Glickman's statements serve to perform such functions, they cannot properly be consigned to the puffery category. *See, e.g., Makor*, 437 F.3d at 597-98; *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1028 (N.D. Ill. 2004)(court would not hold at motion-to-dismiss stage that statements in press release concerning "realized progress" "solid" sales and earnings" constituted puffery).

## 2.   **Scienter**

Corus also argues that plaintiff has not alleged sufficient facts to indicate scienter on Glickman's part. *See* Defs.' Mem. at 22-23.  Specifically, Corus argues that, even assuming that Glickman's statements were false and/or misleading, the complaint's allegations nonetheless fail to support a strong inference that Glickman was aware that his statements were unfounded.  I disagree.

Corus overlooks the fact that officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance." *In re Sears,* 291 F. Supp. 2d at 727 (quotation marks omitted); *see also In re Ligand Pharm.*, 2005 WL 2461151, at *15. It is true that the Seventh Circuit has rejected the "group pleading doctrine," and that, as a result, plaintiffs "must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  As Judge Shadur has explained, however, *Pugh* does not "render each individual defendant's position within a company irrelevant." *Desai v. Gen. Growth Properties, Inc.*, 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009).  Rather, "[i]ndividual positions of authority within a company may still have relevance to the scienter inquiry if that inquiry focuses on whether the plaintiffs have succeeded in creating a strong inference of scienter with respect to each individual defendant." *Id.* (quotation marks omitted). Thus, "[w]hile a court cannot 'presume' scienter, a strong

-29-

inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue. *Id.* (quotation marks omitted).

Plaintiff advances precisely such an argument here. Indeed, the complaint specifically alleges that Glickman himself admitted to being "deeply involved in every major aspect of the lending process." Resp. at 19; Compl. ¶ 91. In light of the complaint's other allegations, Glickman's intimate involvement in the process gives rise to a strong inference that he was aware of Corus's financial troubles and was aware that his statements about the corporation's financial health would be misleading to investors.

For these reasons, I deny Corus's motion to dismiss plaintiff's claims under section 10(b) against Glickman.

### C. Taylor

Finally, Corus argues that plaintiff has failed to state a claim under Rule 10b-5 against Taylor. Corus's chief contention is that the complaint fails sufficiently to allege scienter on Taylor's part. I agree. It is true that, in his role as Corus's CFO, Taylor signed Corus's SEC filings. Even assuming that plaintiff is correct in claiming that the statements in the filings can be attributed to Taylor, *see, e.g., Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 219 (S.D.N.Y. 2008), plaintiff's complaint alleges no facts that would support a strong

inference that Taylor had the requisite scienter in making the statements.  Plaintiff alleges only that "[a]s the top officer in charge of Corus' financial statements, defendants cannot reasonably argue that Taylor was not in a position to know these facts." Resp. at 25; *see also id.* ("Taylor was in a position to know material inside information and that he knew or recklessly ignored materially adverse facts rendering Corus' SEC filings false and misleading.").  An individual's position as a corporate officer, without more, is generally insufficient to support a strong inference of scienter.  *See, e.g.*, *Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, No. 1:08-CV-1041-SEB-DML, 2009 WL 4282940, at *22 (S.D. Ind. Dec. 1, 2009) ("Although, as Plaintiff points out, officers of a company can be assumed to know of facts critical to a business's core operations or to an important transaction that would affect a company's performance, a pleading of scienter may not rest on the inference that defendants must have been aware of information based on their positions within the company.  Indeed, respective positions within the company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA."); *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 803 (N.D. Ill. 2007) (citations, brackets, and quotation marks omitted).

A number of additional considerations serve to undermine even

further any inference that Taylor acted with scienter in signing Corus's SEC forms.  Unlike in the case of Glickman, the complaint makes no allegation that Taylor was deeply involved in the lending process.  Moreover, unlike Glickman -- who merely retained his stock -- Taylor actually *purchased* Corus stock during the class period.  The fact that Taylor purchased Corus stock during the class period is not enough to completely negate an inference of scienter.  *See, e.g.*, *In re Staffmark, Inc. Sec. Litig.*, 123 F. Supp. 2d 1160, 1172 (E.D. Ark. 2000) (defendants' purchase of stock during the class period did not "affirmatively and completely negate scienter" in the case); *see also In re Ligand Pharm., Inc. Sec. Litig.*, (NO. 04CV1620DMS(LSP), 2005 WL 2461151, at *16 n.10 (S.D. Cal. Sept. 27, 2005) (declining to address the issue because plaintiffs did not rely on evidence of insider trading to establish scienter).  Nevertheless, Taylor' purchase of stock, when taken in concert with the other considerations discussed above, is enough to negate an inference of scienter.  Accordingly, I grant Corus's motion to dismiss plaintiff's Rule 10b-5 claims against Taylor.

### D.   Plaintiff's Section 20(a) Claims

In addition to the section 10(b) claims asserted against the defendants in Count I of the complaint, plaintiff also seeks to hold Taylor and Glickman liable as "controlling" persons under section 20(a) of the Exchange Act.  The Seventh Circuit has fashioned a "two-prong test for determining control person

liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994) (quotation marks omitted).  "First, the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability -- even if not exercised -- to control the specific transaction or activity that is alleged to give rise to liability." *Id.* at 911-12.  Notably, "[u]nlike primary liability under § 10(b), controlling person liability under § 20(a) does not require proof of scienter." *Kaufman v. Motorola, Inc.*, No. 95 CV 1069, 1999 WL 688780, at *14 (N.D. Ill. April 16, 1999).  Hence, the fact that a defendant is not liable under section 10(b) does not mean that he cannot be held liable under section 20(a).

Corus does not address the issue of control person liability under section 20(a).  Thus, while Count I of plaintiff's complaint is dismissed as to Taylor, Count II is not; and with respect to Glickman, both Counts I and II remain.  *See, e.g.*, *In re Northpoint Comm'ns Group, Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1106 (N.D. Cal. 2002) (even though Rule 10b-5 claims failed against defendants, court declined to dismiss control person liability claims because parties had not briefed the issue).

### III.  Conclusion

For the reasons discussed above, Corus's motion to dismiss is denied, except with respect to Count I's section 10(b) claim

against Taylor.

ENTER ORDER:

_____
   **Elaine E. Bucklo**
United States District Judge

Dated: April 6, 2010