UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| TRACY JONES, On Behalf of Himself and All) Others Similarly Situated, | ) | No. 1:09-cv-01538 |
| | ) | **(Consolidated)** |
| | ) | |
| Plaintiff, | ) | <u>CLASS ACTION</u> |
| | ) | |
| vs. | ) | Judge Elaine E. Bucklo |
| | ) | |
| CORUS BANKSHARES, INC., ROBERT J. | ) | |
| GLICKMAN, and TIM H. TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
<u>TO PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT</u>**

Defendants Corus Bankshares, Inc., Robert J. Glickman, and Tim H. Taylor by and

through their attorneys, hereby submit their Consolidated Answer and Affirmative Defenses to

Plaintiffs' Consolidated Class Action Complaint (the "Complaint") in this matter as follows.

**SUMMARY OF THE ACTION**

1.      This is a securities fraud class action on behalf of all purchasers of the common
stock of Corus between January 25, 2008 and January 30, 2009 (the "Class Period") for violation
of the Securities Exchange Act of 1934 (the "Exchange Act").

**ANSWER TO PARAGRAPH NO. 1:**

Paragraph 1 constitutes a legal conclusion to which no answer is required.  To the extent

an answer may be required, Defendants admit that the Complaint in this matter purports to assert

a securities fraud class action on behalf of all purchasers of the common stock of Corus during

the Class Period for violation of the Exchange Act.  Defendants deny that they violated any

provision of the Exchange Act and deny any remaining allegations in Paragraph 1.

**Background**

2.     Corus Bankshares, Inc. ("Corus" or the "Company") operates as the holding
company for Corus Bank, N.A. (the "Bank"), which offers various banking products and
services.  The Company primarily engages in generating deposits and originating loans.  Corus'
loan portfolio is primarily comprised of commercial real estate loans, including condominium
("condo") construction and conversion loans, residential real estate loans and other commercial
loans.  Since the 1990s, the Company has been a significant lender in condo space.  As of
December 21, 2007, condo projects comprised nearly 95% of Corus' total loan commitments,
with construction loans representing 90% of those commitments.  Corus' construction loans are
typically structured with "interest reserves," which are provisions that provide developers with
funds to pay down interest during construction, usually a two- to four-year period.  Under such
provisions, the lender is in effect paying itself while the condos are being built.  Once
construction ends, the developer pays off the remaining interest and principal with proceeds from
condo sales.  The majority of Corus' loans are non-recourse loans, meaning they are secured
solely by the value of the underlying property.

**ANSWER TO PARAGRAPH NO. 2:**

Defendants admit that Corus Bankshares, Inc. ("Corus") operated as a bank holding

company registered under the Bank Holding Company Act of 1956 and that Corus Bank, N.A.

("the Bank") was a wholly-owned subsidiary of Corus until on or about September 11, 2009.

Defendants further admit that the Bank offered various banking products and services and that,

through the Bank, Corus primarily focused on commercial real estate lending and deposit

gathering.  All responses herein regarding loans, and actions pertaining to loans, of "Corus" or

"the Company" are based on Corus' ownership of the Bank.  Defendants admit that, as of

December 31, 2007, the Bank's loan portfolio was primarily comprised of commercial real estate

loans, including condominium ("condo") construction and conversion loans, and also included

some residential real estate loans and other commercial loans.  Defendants further admit that as

of December 31, 2007, condominium projects comprised approximately 95% of the Bank's total

loan commitments and construction loans represented approximately 90% of the total

condominium loan commitments.  Defendants also admit that the Bank's construction loans were

typically structured with interest reserves, which allowed a certain portion of a borrower's

interest costs to be capitalized into the loan balance thus eliminating a borrower's initial cash

outlay for interest.  Defendants admit that the majority of the Bank's loans did not have payment

guarantees.  Defendants deny any remaining allegations in paragraph 2.


3.      Corus was incorporated in Minnesota in 1958 and began as a single-office bank
headed by Joseph Glickman, defendant Glickman's father, who was Chairman of the Board of
Directors of Corus until April 2009.  Historically, Corus was active in the student loan market
and residential mortgages.  In the early-1990s, however, bigger banks began undercutting Corus'
rates, so it turned to hotel and office construction loans.  As defendant Glickman explains it, "as
markets changed, we evolved toward condos."

**ANSWER TO PARAGRAPH NO. 3:**

Defendants admit that Corus was incorporated in Minnesota in 1958 as River Forest

Bancorp and that Joseph Glickman, Robert Glickman's father, was Chairman of the Board of

River Forest Bancorp, and then subsequently Corus, from 1966 until April 2009.  Defendants

admit that the Bank was, at times in the past, active in the student loan market and residential

mortgages, and that in the early-1990s the Bank began to focus on commercial real estate loans.

The last sentence in Paragraph 3 purports to be a partial quotation from an unidentified statement

by Robert Glickman and on that basis Defendants lack information sufficient to form a belief as

to the truth of the allegation.  Defendants deny any remaining allegations in paragraph 3.


4.      When Corus first started lending to commercial real estate developers in the early-
1990s, its loans were conservative, ranging from only $250,000 to $4 million.  To originate these
loans, Corus employed a small executive team with a compensation system that punished
officers for poorly performing loans and rewarded them for good ones.  By 2006, however, the
nation had entered a condo frenzy, and Corus began departing from its conservative ways.
Defendant Glickman was so bullish on the market in 2005 and 2006 that in some cases he
departed from the 80% presale norm and let Corus make loans if only half of a proposed
building's condos were presold, or in some cases if none were sold.  Corus' loans also grew
bigger and more audacious, ranging from a minimum of $20 million to over $288 million in
2006.  Corus closed 12 condo loans totaling $746 million in March 2006 alone, and another five

3

condo loans totaling $870.6 million during the month of December 2006. Corus even closed a $191.8 million construction loan in 2006 for a 52-story, 530-condo tower in downtown Miami by providing both the first and mezzanine (subordinate) mortgages, and then later funded another 500-condo building nearby.

**ANSWER TO PARAGRAPH NO. 4:**

Defendants admit that the loans made by the Bank in the early 1990's were generally smaller in size than the loans that it was able to make in later years based on its substantial growth. Defendants further admit that some loans made by the Bank in 2005 and 2006 were on projects that were not 80 percent pre-sold. Defendants Corus and Glickman admit that the Bank provided first and mezzanine loans as part of a $191.8 million construction loan in 2006 for a 52-story, 530-condo tower in downtown Miami and further that the Bank in 2005 had funded another building with approximately 500 condos nearby. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the last sentence of paragraph 4. Defendants deny any remaining allegations in paragraph 4.

5.      By 2007, however, the housing market was showing signs of deterioration. From June 2007 through August 2007, condo sales in Las Vegas and Miami alone fell 46% and 29%, respectively, from the same three-month period the prior year, and speculation was growing that the frothy condo market was past its peak. At the same time, Corus' construction loans originated during the housing frenzy were approaching maturity. An astonishing $3.96 billion of Corus' loans – about 90% of the Company's loans outstanding – were due for maturity or re-pricing by early to mid-2008. More than $2 billion of these loans were in South Florida alone. This meant that thousands of condo units planned during the robust housing years were due to enter a glutted market amid buyer cancellations, declining property values and a gridlocked mortgage market. Indeed, Corus Executive Vice President of Commercial Lending Michael Stein ("Stein") admitted in a January 1, 2008 article that "*[2008] is going to be an interesting year because a lot of projects are going to be delivered to the market . . . . If developers sell only 5% or 10% [of their units], then it will be a disaster . . . . If they sell half, there will be a lot of pain . . . .*"[1]  Not surprisingly, given the market, condo projects were not generating the expected sales. Moreover, as Corus noted in its 2007 Form 10-K, "an increasing number of borrowers [we]re requesting extensions and other amendments to their loans." Because the construction loans were still technically performing, however, the full stress of these distressed loans on Corus was hidden from public view.

---

[1]      Here, as elsewhere, emphasis has been added unless otherwise noted.

**ANSWER TO PARAGRAPH NO. 5:**

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation in the second sentence.  Sentence 7 purports to be a partial quotation from an unidentified statement by Michael Stein and on that basis Defendants lack information sufficient to form a belief as to the truth of the allegation.  Sentence 8 refers to selected contents of Corus' 2007 Form 10-K, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 5.

6.      To make matters worse, and contrary to defendants' Class Period assurances of the Company's "*fortress-like balance sheet*," Corus had done little to position its balance sheet for severe problems.   As of December 31, 2007, Corus' noncurrent condo loans nearly quadrupled from a year earlier to $282.8 million.  Yet Corus had reserved only approximately $71 million, or one quarter the value of all noncurrent loans.  Interestingly, the Company had set aside a bigger relative provision for noncurrent loans, 42%, in 2006, before the housing market began to deteriorate.

**ANSWER TO PARAGRAPH NO. 6:**

Defendants admit that as of December 31, 2007, the Bank's nonperforming loans totaled approximately $282.6 million and that the Bank's allowance for loan losses was approximately $71 million.  Defendants deny any remaining allegations in paragraph 6.

7.      Overall, Corus' allowance for loan losses was only 1.6% of loans as of December 31, 2007.  The allowance would be increased to 6.6% of loan losses by year-end 2008 and to 8.17% by March 31, 2009.[2]

**ANSWER TO PARAGRAPH NO. 7:**

Defendant Corus admits that the Bank's allowance for loan loss reserves was approximately:  (1) 1.61% of loans as of December 31, 2007; (2) 6.65% of loans as of December

---

[2]      The March 31, 2009 results would subsequently have to be restated due to Corus' understatement of credit losses.

31, 2008; and (3) 8.14% of loans as of March 31, 2009.   Defendant Taylor admits the December

31, 2007 loan loss reserve percentage, but lacks knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in paragraph 7.   Defendant Glickman admits the

December 31, 2007 and December 31, 2008 loan loss reserve percentages, but lacks knowledge

or information sufficient to form a belief as to the truth of the remaining allegations in paragraph

7.  Defendants deny any remaining allegations in paragraph 7.

**Summary of Defendants' False and Misleading Class Period Statements**

8.      On January 25, 2008, the start of the Class Period, Corus issued a press release announcing its earnings for the fourth quarter of 2007 and fiscal year 2007.   Despite the Company's year-over-year earnings decline of 44%, defendant Glickman confidently reassured investors that Corus "***anticipate[d] a significant amount of originations in the first quarter of 2008***" and would "***weather the storm***."   Defendants continued these reassurances throughout the Class Period, stating repeatedly that Corus would "***be able to absorb any losses that may occur, even assuming the housing crisis deepens further and extends to 2010 before there is meaningful recovery***."   Even as Corus' 2008 quarterly earnings plummeted, defendants continued to reassure investors that Corus would originate a "***significant number of new loans***" in 2008 and that Corus felt "***very good about the credit quality and profitability of this new business***."   In fact, defendant Glickman reiterated these assurances to investors as late as August 6, 2008, over one month into Corus' third quarter, despite the fact that Corus did not originate any loans in the third quarter and had already stopped originating new loans.

**ANSWER TO PARAGRAPH NO. 8:**

Defendants admit that on January 25, 2008, Corus issued a press release announcing its

earnings for the fourth quarter and fiscal year of 2007.  Sentence 2 refers to selected contents of

Corus' January 25, 2008 press release, which speaks for itself and Defendants refer to the full

content of that document and deny any allegations inconsistent therewith.   Sentences 3-5 in

Paragraph 8 purport to be a partial quotations from unidentified statements by "Defendants" and

on that basis Defendants lack information sufficient to form a belief as to the truth of the

allegation.  Defendants deny any remaining allegations in paragraph 8.

6

9. Defendants' projections and reassurances had no reasonable basis. Defendants knew that Corus could not continue to originate healthy loans at profitable levels in the collapsing real estate market and would not be able to "weather the storm." Indeed, in a desperate attempt to pump up loan originations, defendants modified Corus' long-standing commission plan during the Class Period to reward loan officers for risky, low-quality loans. Prior to this change, a portion of an officer's commission was withheld by the Company for a substantial period of time and was at risk of loss in the event the Company suffered a loss on a loan originated by the officer. However, under the new commission program, announced January 25, 2008 (but applied retroactively to loans originated on or after November 1, 2006), loan officers would be able to keep their full commission on loans originated *even if those loans resulted in a loss*. This scheme to pump up new loans allowed defendants to maintain the perception that Corus was continuing to originate healthy loans throughout 2008 despite the deteriorating market conditions. Indeed, defendants announced on April 29, 2008, and again on May 8, 2008, that:

> [i]n spite of the difficult market conditions, Corus successfully originated $821 million in new commercial real estate loans during the first three months of 2008. This was not only substantially *higher* than the $321 million of originations during the first quarter of 2007, *but in fact above the highest level of quarterly originations during 2007*.

Notably, defendants cancelled the new commission program on October 30, 2008 (effective November 1, 2008), but only *after* announcing that they were no longer originating loans.

## ANSWER TO PARAGRAPH NO. 9:

Defendants admit that on November 27, 2007, the Bank approved changes to the way it compensated its commercial loan officers. Defendants further admit that the enactment of new rules regarding the accounting for deferred compensation prompted Corus' changes to its compensation plan. Defendants admit that in light of these new deferred compensation rules, the Bank's new compensation structure ("new CLO program"), which was effective for all loans originated after November 1, 2006, did not contain a holdback provision, but officers continued to share in the risk of loss, as their current year commission was still exposed to reduction, even elimination, in the event of losses on their loans. Defendants admit that the new CLO program was cancelled in or about October 2008, with an effective date of November 1, 2007, thereby eliminating any payments due in 2008. Sentences 7 and 8 purport to be a partial quotation from an unidentified statement by "defendants" and on that basis Defendants lack information

sufficient to form a belief as to the truth of the allegation.  Defendants deny that the Bank's

change in compensation structure was part of a scheme to inflate loan originations and deny that

there was no reasonable basis for their financial projections.  Defendants deny any remaining

allegations in paragraph 9.

10.    Defendants also misled the market to believe that Corus was well-capitalized and in prime condition to take advantage of the market downturn, repeatedly touting Corus' "*tremendous capital strength*."  Defendants even told investors that they had *expected* a severe downturn in the residential real estate markets, and had "*always expressly provided for . . . a downturn*" and "*positioned ourselves accordingly*."  Defendants knew, however, that Corus' capital position was deteriorating faster than investors were led to believe.  In fact, defendant Glickman later admitted that he and other senior management were involved in "ongoing discussions" with the Federal Reserve Bank of Chicago ("FRB") and the Office of the Comptroller of the Currency ("OCC") for several months during the Class Period to address Corus' capital problems – in direct contradiction to his assurances throughout the Class Period that Corus "*continue[d] to have a strong capital position*."

**ANSWER TO PARAGRAPH NO. 10:**

Sentences 1, 2 and 4 contain what purport to be partial quotations from unidentified

statements by "defendants" and on that basis Defendants lack information sufficient to form a

belief as to the truth of the allegations.  Defendants deny that they misled the market or investors

as to Corus' financial condition and deny any remaining allegations in paragraph 10.

11.    Additionally, defendants falsely assured investors that the primary collateral on Corus' loans, *i.e.*, the underlying condo units, would maintain their value and "*not become worthless*," despite the economic conditions.  Particularly in Miami, an area heavily invested in by Corus and hit hardest by the housing glut, defendants reassured investors that Corus' projects were still "*very desirable housing*," and "*may be more desirable than the great majority of all housing units in the Miami area*."  And, defendants reassured investors, Corus' loans were so "*conservatively underwritten*" that even if the collateral values were to decrease, there was still room built into the loans for Corus to "*get repaid in full*."

**ANSWER TO PARAGRAPH NO. 11:**

Paragraph 11 contains what purport to be partial quotations from unidentified statements

by "defendants" and on that basis Defendants lack information sufficient to form a belief as to

the truth of the allegations. Defendants deny making any false statements to investors and deny

any remaining allegations in paragraph 11.

12.     Defendants knew these statements were false and misleading. Contrary to their Class Period reassurances, the value of Corus' loans and underlying collateral was rapidly deteriorating along with the market. By the start of the Class Period, the construction on many new condo projects had already fallen behind schedule and construction costs had become much higher than expected, thereby threatening the completion of many projects. Moreover, approximately 90% of the Company's loans outstanding were due for maturity or re-pricing by early to mid-2008, more than $2 billion of which were in South Florida alone. Because the condo bubble had burst, however, Corus-funded condo projects were not generating the expected sales. By 2008, mortgage loans had become increasingly difficult to obtain. As a result, an increasing number of buyers who signed "presale" purchase agreements before construction even began and put down deposits of 3% to 30% of the condo purchase price simply walked away from their purchase commitments, leaving many completed condos unsold. The proceeds that were to come from these condo closing were the source from which Corus' loans would be repaid. Without any sales, defendants had little to no expectation of Corus' loans being repaid.

**ANSWER TO PARAGRAPH NO. 12:**

Defendants deny the allegations in paragraph 12.

13.     As a result, defendants knew that many of these loans, even if technically still performing, were fast approaching failure and/or potential foreclosure. Indeed, although not disclosed to investors, Corus utilized at least 26 Special Purpose Entities ("SPEs"), or Corus-affiliated entities, during the Class Period for the purpose of acquiring and/or controlling these distressed properties in the event of foreclosure on the associated loans. Tellingly, in the midst of Corus' deteriorating financial condition, Corus' Chief Financial Officer ("CFO"), defendant Taylor, along with Stein, both unexpectedly resigned in October 2008.

**ANSWER TO PARAGRAPH NO. 13:**

Defendants admit that Tim Taylor, Corus' Chief Financial Officer, resigned on or about

October 6, 2008 and Michael Stein, Executive Vice-President of the Bank, resigned on our about

October 30, 2008. Defendants Corus and Glickman deny the allegations contained in sentence 2.

Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in sentence 2. Defendants deny any remaining allegations in paragraph 13.

14.    In a desperate attempt to conceal Corus' dire financial condition and falsely stimulate the condo market, defendants began manufacturing sham condo sales. On November 24, 2008, Corus and/or its affiliates began purchasing condos in Corus-funded developments to create the illusion of successful sales. To ensure the collateral retained a high value, defendants offered significantly above market value for the units, paying $481 per square foot for one unit when a similar unit was listed at only $388 per square foot. Through these sham purchases, defendants were able to inflate the appraised values of the collateral and delay Corus having to recognize a loss on the underlying loans. Additionally, defendants wanted to inflate developers' sales figures to increase the likelihood of successful future sales and to inflate appraisal values to ensure inflated prices for the condos.

**ANSWER TO PARAGRAPH NO. 14:**

Defendants Corus and Glickman deny the allegations in paragraph 14. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in sentence 2 and denies any remaining allegations in paragraph 14.

**Defendants Concealed Impairments and Losses in Corus' Loan Portfolio in Violation of GAAP**

15.    Corus' publicly issued financial statements and related earnings releases during the Class Period were materially misstated in violation of Generally Accepted Accounting Principles ("GAAP") and Securities and Exchange Commission ("SEC") rules because defendants failed to record adequate and timely loan loss reserves and misled investors as to the significant loss exposure Corus faced related to the Company's loan portfolio. As a result, Corus' reported net loans, pre-tax income and earnings per share ("EPS") were materially overstated and its provision for credit losses was understated at each quarter during the Class Period.

**ANSWER TO PARAGRAPH NO. 15:**

Defendants deny the allegations in paragraph 15.

16.    Corus' loan portfolio was rapidly deteriorating prior to and during the Class Period, yet defendants failed to recognize the losses in accordance with GAAP. While the general risks with the loans associated with the deteriorating housing market were recognized by investors, defendants assured investors that Corus' projects were "***more desirable***" than other housing units and that the Company had a "***fortress-like balance sheet***" and was in a strong capital position with strong liquidity. In reality, Corus' capitalization and loan portfolio were rapidly deteriorating along with the market. Default rates began to rise sharply at Corus, going from only one foreclosure in 2007 to eight by September 30, 2008, and 18 by December 31, 2008. Moreover, condo sales in markets in which Corus was heavily invested had decreased dramatically, and sales in Corus-funded developments were well below expectations.

Additionally, in order to inflate the volume of loans, defendants began sacrificing loan quality by originating riskier loans.  Meanwhile, defendants continued to tout Corus' strong financial statements, while failing to record adequate and timely loan loss reserves on Corus' loan portfolio.  Defendants ignored numerous red flags – all of which should have strongly indicated to defendants that the visibility and value of Corus' portfolio was impaired – and hid the mounting losses and risks associated with Corus' lending business from investors.

**ANSWER TO PARAGRAPH NO. 16:**

Defendants admit that the Bank reported one foreclosure in 2007 and was in the process of foreclosing on eight non-accrual loans as of September 30, 2008.  Defendants Corus and Glickman further admit that the Bank was in the process of taking possession of eighteen properties as of December 31, 2008; Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of that allegation.  Sentence 2 contains what purports to be partial quotations from unidentified statements by "defendants" and on that basis Defendants lack knowledge or information sufficient to form a belief as to the truth of those allegations. Defendants deny the allegations that they failed to recognize Corus' losses in accordance with GAAP or hid Corus' losses or business risks from investors.  Defendants deny any remaining allegations in paragraph 16.

17.    Defendants were required, under GAAP, to take into account various portfolio attributes (*e.g.*, Corus' high concentration in condo construction loans, Corus' increases in charge- offs and foreclosures, etc.) in evaluating the possible impairment of Corus' loan portfolio and in the calculation of appropriate loan loss reserves at the end of each quarter.  Moreover, in calculating Corus' loan loss reserves, defendants were required to consider the declining value of the collateral backing its loans.  In assessing loans for impairment, defendants should have identified loans in which it was probable that the Company would be unable to collect all amounts due according to the terms of the loan agreements and then evaluated the fair value of the underlying collateral to arrive at estimated impairment losses.  Given that the value of the underlying assets of Corus' loans was dropping rapidly – to the extent that defendants felt it necessary to engage in fraudulent condo purchases to inflate appraisal values – market conditions required that defendants adjust Corus' loan losses to reflect the heightened default risks. Defendants, however, failed to timely adjust Corus' loan losses or reassess the value of the Company's collateral assets.

**ANSWER TO PARAGRAPH NO. 17:**

Paragraph 17 refers to selected GAAP provisions, which speak for themselves and Defendants refer to the full content of those provisions and deny any allegations inconsistent therewith.  Defendants deny that they failed to comply with the applicable GAAP provisions.  Defendants deny that they engaged in fraudulent condominium purchases and deny any remaining allegations in paragraph 17.

18.    As the market worsened, however, defendants were forced to disclose that its assets had been overvalued and under-reserved.  Ultimately, at the end of the Class Period, Corus had to increase its allowance for loan losses by four-fold, from 1.61% of loans as of December 31, 2007, to 6.641% as of December 31, 2008, and 8.14% as of March 31, 2009.  The provision for credit losses increased to $637.5 million in 2008, almost ten times as much as was recorded in 2007.  In accordance with GAAP and reflecting the already known risks and impairments to Corus' loan portfolio, a substantial portion of these losses should have been taken in the form of loan loss reserves beginning no later than December 2007.  Had defendants complied with GAAP and properly accounted for the true value of the loan portfolio, the reported losses would have wiped out all of Corus' earnings and given investors a true picture of the Company's dire financial condition.

**ANSWER TO PARAGRAPH NO. 18:**

Defendant Corus admits that the Bank increased its allowance for loan loss reserves from approximately 1.61% of loans as of December 31, 2007, to approximately 6.65% as of December 31, 2008, to approximately 8.14% as of March 31, 2009, and that the Bank increased its provision for credit losses to approximately $637.5 million in 2008.  Defendant Taylor admits the December 31, 2007 loan loss reserve percentage, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in sentences 2 and 3.  Defendant Glickman admits the December 31, 2007 and December 31, 2008 loan loss reserve percentages and the 2008 provision for credit losses, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in sentence 2.  Defendants

deny that they did not fully comply with GAAP in accounting for the Bank's loan loss reserves

or in valuing the loan portfolio and deny any remaining allegations in paragraph 18.

19.     Although hidden from investors, defendants' ambitious fraud did not go unnoticed.  On January 30, 2009, the *South Florida Business Journal* published an article disclosing defendants' deceptive practices to the market.  The article announced that defendants were attempting to manipulate the condo market through sham purchases and disclosed the use of Corus-affiliated entities to perpetrate the fraud.  Later that day, Corus released its partial financial results for fiscal year 2008, stating that it "***has seen a rapid and precipitous decline in the value of the collateral securing our loan portfolio***."  The Company also announced for the first time that it had been ***engaged in discussions with bank regulators*** and "***may no longer be considered well-capitalized***."  Those discussions ultimately resulted in Corus entering into a Written Agreement and Consent Order with the FRB and OCC strictly limiting Corus' operations.  As a result of the January 30, 2009 disclosures, Corus' stock price dropped nearly 47% to close at $0.59 per share on February 2, 2009.

**ANSWER TO PARAGRAPH NO. 19:**

Defendants Corus and Glickman admit that Corus ultimately entered into a written

agreement with the Federal Reserve Board and a consent order with the Office of the

Comptroller of the Currency; Corus and Glickman state further that this agreement speaks for

itself, and refer to the full content of that agreement and deny any allegations inconsistent

therewith.  Defendants Corus and Glickman further admit that the closing price of Corus' stock

on  January 30, 2009, was $1.11 per share and $0.59 per share on February 2, 2009.  Defendants

Glickman and Corus lack knowledge or information as to the January 30, 2009 South Florida

Business Journal article referenced in sentences 2 and 3 sufficient to form a belief about the truth

of those allegations.  Sentences 4 and 5 refer to selected contents of Corus' January 30, 2009

press release, which speaks for itself and Defendants Corus and Glickman refer to the full

content of that document and deny any allegations inconsistent therewith.  Defendants Corus and

Glickman deny any remaining allegations in paragraph 19.  Defendant Taylor lacks knowledge

or information sufficient to form a belief as to the truth of the allegations in paragraph 19.

20.    On April 24, 2009, defendant Glickman, Corus' director and Chief Executive Officer ("CEO"), resigned.  The stock has not recovered and currently trades at approximately $0.25 per share.  On July 17, 2009, *Bloomberg* news reported that United States regulators were poised to seize Corus:

> The Federal Deposit Insurance Corp. has indicated the bank may be taken over by the government within the next several weeks, said the people, who declined to be identified because the talks are private.  Thomas Barrack's Colony Capital LLC and Related Cos., the developer of New York's Time Warner Center, are among the investors who've expressed interest in Corus's assets, people with knowledge of the talks said June 4.

**ANSWER TO PARAGRAPH NO. 20:**

Defendants Corus and Glickman admit that during the putative Class Period Robert J. Glickman was Corus' President and Chief Executive Officer until his resignation on or about April 24, 2009.  Defendants Corus and Glickman lack knowledge or information as to the July 17, 2009 Bloomberg article referenced in sentences 3-5 sufficient to form a belief about the truth of those allegations.  Defendants Corus and Glickman deny any remaining allegations in paragraph 20. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20.

## JURISDICTION AND VENUE

21.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

**ANSWER TO PARAGRAPH NO. 21:**

Paragraph 21 states only legal conclusions to which no answer is required.  To the extent that an answer may be required, Defendants admit that Plaintiffs purport to bring a claim under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Defendants deny that they violated §§10(b) and 20(a) of the Exchange Act,

15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  Defendants admit that

this Court has subject matter jurisdiction over this action.  Defendants deny any remaining

allegations in paragraph 21.

22.     Venue is proper in this District because defendants have their principal executive
offices in this District, and many of the wrongful acts alleged herein took place or originated in
this District.

**ANSWER TO PARAGRAPH NO. 22:**

Paragraph 22 states a legal conclusion to which no answer is required.  To the extent that

an answer may be required, Defendants admit that Corus' principal executive office is located in

the Northern District of Illinois.  Defendants deny any remaining allegations in paragraph 22.

23.     Defendants used the instrumentalities of interstate commerce, the United States
mails and the facilities of the national securities markets in connection with the wrongful activity
alleged herein.

**ANSWER TO PARAGRAPH NO. 23:**

Defendants deny the allegations in paragraph 23.

**PARTIES**

24.     Plaintiff Todd L. Johnson (on behalf of himself, Todd L. Johnson, IRA and his
company, Reuben Johnson & Son, Inc. (collectively, "Johnson")) purchased Corus common
stock as set forth in the accompanying certifications (Ex. A) which are incorporated herein by
reference, and was damaged thereby.

**ANSWER TO PARAGRAPH NO. 24:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 24 of the Complaint regarding Plaintiff Johnson's purchases of Corus

stock.  Defendants deny any remaining allegations in Paragraph 24.

25.     Defendant Corus describes itself as a "bank holding company headquartered in
Chicago, Illinois."  Corus conducts its banking operations through its wholly-owned banking

subsidiary, the Bank. The Bank is a nationwide construction lender, specializing in condo, office, hotel, and apartment projects. Its outstanding commercial real estate loans and unfunded construction commitments total approximately $5.8 billion.

**ANSWER TO PARAGRAPH NO. 25:**

Defendants admit that Corus operated as a bank holding company headquartered in Chicago, Illinois and that the Bank was a wholly-owned subsidiary of Corus until on or about September 11, 2009. Defendants admit that, in recent years, the Bank specialized in construction lending for condominiums, offices, hotels and apartment projects. Defendants deny any remaining allegations in paragraph 25.

26.     Defendant Robert J. Glickman was, at all relevant times, the CEO and a director of Corus. Glickman resigned on April 24, 2009.

**ANSWER TO PARAGRAPH NO. 26:**

Defendants Corus and Glickman admit that Robert J. Glickman was the President and Chief Executive Officer of Corus, and a member of Corus' board of directors, during the putative class period, and that Mr. Glickman resigned these positions on or about April 24, 2009. Defendant Taylor admits that during his employment with Corus, Mr. Glickman was the President and Chief Executive Officer of Corus and a member of its board of directors. Defendants deny any remaining allegations in paragraph 26.

27.     Defendant Tim H. Taylor was, at all relevant times, the CFO of Corus, until his resignation on October 6, 2008.

**ANSWER TO PARAGRAPH NO. 27:**

Defendants admit that Tim H. Taylor was Chief Financial Officer of Corus from the start of the putative class period until his resignation on or about October 6, 2008. Defendants deny any remaining allegations in paragraph 27.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

28.     Defendants are liable for: (i) making false and misleading statements or (ii) failing to disclose adverse facts known to them about Corus. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Corus common stock was a success, as it: (i) deceived the investing public regarding Corus' prospects and business; (ii) artificially inflated the price of Corus common stock; and (iii) caused plaintiff and other members of the Class to purchase Corus common stock at inflated prices.

## ANSWER TO PARAGRAPH NO. 28:

Defendants deny the allegations in paragraph 28.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD

29.     The Class Period starts on January 25, 2008. On that date, Corus issued a press release announcing its earnings for the fourth quarter of 2007 and fiscal year 2007. The Company reported earnings of $1.9 million, or $0.03 per share, for the quarter and $106.2 million, or $1.85 per share, for the year, a decline of 44% over 2006. Defendants attributed the year-over-year decline to weakness in the housing and mortgage market and a slowdown in the economy. Despite these disappointing results, however, defendant Glickman reassured investors that Corus would "**be able to absorb any losses that may occur**" and would "**weather the storm**":

> "Continued weakness in the housing and mortgage markets, combined with a general slowdown in the economy, has resulted in a significant decline in Corus' 2007 earnings. With a fourth quarter profit of only $1.9 million, this is clearly the worst quarter we have seen in many, many years. *While I am disappointed to see such low earnings, I remain confident in our business model and I fully expect Corus to be able to absorb any losses that may occur. We continue to have a strong capital position, strong liquidity and an excellent management team . . . .*"

                         *          *          *

> "In spite of the difficult market conditions, Corus successfully originated over $2 billion in new loans during 2007. While this is down considerably from last year's originations, it is nevertheless a significant amount of business. *Furthermore, we anticipate a significant amount of originations in the first quarter of 2008, perhaps as much as $1 billion. Much of that new business is expected to be in our area of particular expertise, the condominium market. However, due to the upheaval in various financial markets, we are seeing recent opportunity in the office market and we expect to see a considerable portion of our near-term originations in that sector as well.* With the potential for a near-term recession, though, we are mindful to approach new business with a cautious, even pessimistic, view of the markets."

17

\*       \*       \*

"In summary, at this point in the housing cycle, we are experiencing loan quality issues which are contributing to significant declines in earnings.  The impact of the current credit crisis in the U.S. and abroad is having far-reaching consequences and it is difficult to say at this point what the ultimate impact will be on Corus.  For our part, we are working diligently with our borrowers to collectively address any loan issues, realizing that in some cases foreclosure may ultimately be our best course of action.  ***Nevertheless, I am confident we can 'weather this storm*.'"

\*       \*       \*

**Originations** – In 2007, we originated $2.0 billion of new loans, which is significantly lower than last year's originations, but consistent with what we estimated in the third quarter earnings release.  It is a significant amount of business, even if it is quite a bit less than in previous years.  If you look at the past five years, our originations tracked to the housing boom and bust.  From 2003 to 2007, originations climbed from $2 billion in 2003 to $5 billion in 2005 and back down to $2 billion in 2007.  ***As for 2008, we expect that a significant number of new loans will close in the first quarter, perhaps as much as $1 billion.  Much of that new business is expected to be in our area of particular expertise, the condominium market.   Many other lenders have backed away from condominium lending in the current environment, and we believe this creates an opportunity for us to do more business at better terms*.  In addition, due to the upheaval in various financial markets, we are seeing recent opportunity in the office market and we expect to see a considerable portion of our near-term originations in that sector as well.  *We feel very good about the credit quality and profitability of this new business*.

**ANSWER TO PARAGRAPH NO. 29:**

Sentence 1 of paragraph 29 states a legal conclusion, to which no answer is required.

Defendants admit that on January 25, 2008, Corus issued a press release, which speaks for itself

and Defendants refer to the full content of that document and deny any allegations inconsistent

therewith.  Defendants deny any remaining allegations in paragraph 29.

30.     In the press release, Corus also announced that during the fourth quarter 2007, the Company repurchased two million shares of its common stock and authorized a new Share Repurchase Program to acquire up to five million additional shares.

**ANSWER TO PARAGRAPH NO. 30:**

Defendants admit that on January 25, 2008, Corus issued a press release, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 30.

31.     Analysts responded favorably to defendants' reassurances despite the tough economic environment, particularly Corus' share repurchases.  For example, on February 1, 2008, Howe Barnes Hoefer & Arnet reported that:  "During the quarter [Corus] repurchased 1.5 million shares at an average price of $9.87 and has 4.7 million shares left in its current program. *Given current valuation levels, we view the company's repurchase activity as prudent and underline management's belief that capital and earnings levels are viable and sustainable*."

**ANSWER TO PARAGRAPH NO. 31:**

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31.

32.     Due to defendants' positive but false statements, Corus' stock price increased from $10.58 per share on January 25, 2008 to $12.72 per share by January 31, 2008.

**ANSWER TO PARAGRAPH NO. 32:**

Defendants admit that Corus' stock price closed at $10.58 per share on January 25, 2008 and $12.72 per share on January 31, 2008.  Defendants deny any remaining allegations in paragraph 32.

33.     On February 27, 2008, defendants signed and filed with the SEC Corus' 2007 Form 10-K and 2007 Annual Report.  In these filings, defendants reiterated their positive but false reassurances to investors.  In the Form 10-K, defendants stated:

> *We try to maintain liquidity and capital at levels appropriate not only for the funded balances, but also for the unfunded commitments, being cognizant of the fact that loan repayments may not be sufficient to meet all funding requirements pursuant to existing loan agreements. . . .  Management estimates that as much as $1 billion of the loans in our pipeline might close in the first quarter of 2008*.

\*       \*       \*

*With regard to the Company's largest business, commercial real estate lending, management believes it maintains a competitive edge in various ways*. First, management is willing to hold larger loans than many competitors thereby reducing the borrower's syndication risk.  Second, a flat management structure allows for quicker decision making and execution compared to competitors. Third, management has developed a reputation for reliability that is enhanced by the involvement of senior management in every transaction.  Finally, management is able to customize transactions to meet customer needs.

**ANSWER TO PARAGRAPH NO. 33:**

Defendants admit Messrs. Glickman and  Taylor signed, and on February 27, 2008 Corus filed with the SEC, Corus' 2007 Form 10-K and 2007 Annual Report.   The remainder of paragraph 33 refers to selected contents of Corus' 2007 Form 10-K, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny they knowingly made any false statements in Corus' 2007 Form 10-K, or at any other time.  Defendants deny any remaining allegations in paragraph 33.

34.     Defendants made similar positive but false statements in the Company's 2007 Annual Report:

Our main focus at this time is to manage our business during this significant downturn and to be poised to take advantage of the market when it does recover.  *We are not contemplating any major changes in our business model.  We fully expect Corus to be able to absorb any losses that may occur, even assuming the housing crisis deepens further and extends to 2010 before there is a meaningful recovery.  We continue to have a strong capital position, strong liquidity, and an excellent management team.  We are confident that we can weather this storm*.

\*     \*     \*

Our portfolio of condominium construction loans, which makes up 85% of our loan portfolio, is all new construction and is *very desirable housing*.   Even in Miami, which is experiencing a glut of condominiums, *we believe our collateral may be more desirable than the great majority of all housing units in the Miami area.  In our opinion, brand new condominiums will not become worthless. . . . Many other lenders have backed away from condominium lending in the current environment, and we believe this creates an opportunity for us to do more business at better terms.  We feel very good about the credit quality and profitability of all of the new business*.  It is very important for the Bank's

20

earnings that we continue to originate new loans.  We approach new business with a cautious, even pessimistic view of the markets.  We anticipate that the housing market will continue to weaken throughout 2008 and 2009, and we are also cognizant of the risk that the economy could tilt into recession in 2008, as various economists predict. . . .  ***We do not anticipate any change in our strategy of pursuing a smaller number of larger loans.  This maximizes our ability to include senior management in all material loan decisions. . . .  Our general lending approach has not changed as a result of the housing market meltdown***, although we are always fine-tuning our methods and have learned quite a bit form our various problem loans.

*       *       *

***We believe that our loans were conservatively underwritten, generally leaving room for our loan amounts to increase or the collateral values to decrease and still have the Bank get repaid in full.***

***With all of this discussion of slowing loan volume and potential credit problems, we would like to reiterate that we do, nonetheless, continue to see good opportunities for new construction loans for condominiums, office, hotel and apartment projects.  We continue to believe that many profitable opportunities, both for the Bank and its customers, exist in many cities across the country to build and develop commercial real estate projects.  While other lenders may be afraid of the construction loan market, this helps us by limiting competition.***

*       *       *

***It is our belief and expectation that an investment in Corus stock will pay off, but over the long run.***

*       *       *

Continued weakness in the housing and mortgage markets, combined with a general slowdown in the economy, has resulted in a significant decline in Corus' 2007 earnings.  While management is disappointed to see the decrease in earnings, ***we remain confident in Corus' business model and fully expect the Company to be able to absorb any losses that may occur.  Corus continues to have a strong capital position, strong liquidity and an excellent management team***.

*       *       *

In spite of the difficult market conditions, Corus successfully originated over $2 billion in new loans during 2007.  While this is down considerably from last year's originations, it is nevertheless a significant amount of business.  ***Furthermore, management anticipates a significant amount of originations in the first quarter of 2008, perhaps as much as $1 billion.  Much of that new***

***business is expected to be in Corus' area of particular expertise, the condominium market***.   However, due to the upheaval in various financial markets, the Company is seeing recent opportunity in the office market and expects to see a considerable portion of its near-term originations in that sector as well.

\*          \*          \*

In summary, at this point in the housing cycle, we are experiencing loan quality issues which are contributing to significant declines in earnings.   The impact of the current credit crisis in the U.S. and abroad is having far-reaching consequences and it is difficult to say at this point how long this process will take to "unwind" and its long-term implications for Corus.   The Company is working diligently with its borrowers to collectively address any loan issues, realizing that in some cases foreclosure may ultimately be the best course of action. ***Nevertheless, management is confident Corus can weather this storm***.

**ANSWER TO PARAGRAPH NO. 34:**

Paragraph 34 refers to selected contents of Corus' 2007 Annual Report, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.   Defendants deny that they knowingly made any false statements in Corus' 2007 Annual Report, or at any other time, and deny any remaining allegations in paragraph 34.

35.    Corus' 2007 Form 10-K also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Glickman and Taylor:

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. . . .

\*          \*          \*

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**ANSWER TO PARAGRAPH NO. 35:**

Paragraph 35 refers to selected contents of Corus' 2007 Form 10-K, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 35.

36.    On April 29, 2008, Corus issued a press release announcing its financial results for the first quarter of 2008, the period ending March 31, 2008.  For the quarter, Corus reported earnings of $0.08 per share, or a loss of $0.05 per share excluding gains from a stock portfolio liquidation.  Corus continued to maintain that it would be able to weather the collapse in the condo market while at the same time stating that it would be eliminating its quarterly dividend. Defendant Glickman commented on the announcement stating in pertinent part as follows:

> *"While I am disappointed to see such low earnings, I remain confident in our business model and I fully expect Corus to be able to absorb any losses that may occur.  We continue to have a strong capital position, strong liquidity and an excellent management team."*

*       *       *

> In spite of the difficult market conditions, Corus successfully originated $821 million in new commercial real estate loans during the first three months of 2008.  This was not only substantially higher than the $321 million of originations during the first quarter of 2007, but in fact above the highest level of quarterly originations during 2007.  *With the potential for a near-term recession and with a goal of not adding any new problem loans to our portfolio, we are mindful to approach new business with a cautious, even pessimistic, view of the markets*.  We are pleased to report that over half of the 2008 first quarter originations were in the office sector.  *We are seeing new opportunities in the office, apartment, and hotel markets as a result of the upheaval in financial markets*.  We expect to see a considerable portion of our near-term originations in these three non-condominium sectors as well.  We are pleased to create diversification in our loan portfolio by property type.

> Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise.  *We are not contemplating any major changes in our business mode.  We fully expect Corus to be able to absorb any losses that may occur, even assuming the housing crisis deepens further and extends to 2010 before there is meaningful recovery.  We continue to have a strong capital position, strong liquidity, and an excellent management team.  We are confident that we can weather this storm*.

*       *       *

23

In the first quarter of 2008, we originated $821 million of new loans. *We expect originations to remain strong during the rest of the year, and hope to book a total of between $2 billion and $3 billion of new business for the entire year of 2008*. Given the growth in problem loans in our existing portfolio, *we are being very demanding on new credits, and looking for extremely large equity investments. We feel very good about the credit quality and profitability of this new business*.

We are approaching new business with a cautious, even pessimistic view of the markets. We anticipate that the housing market will continue to weaken throughout 2008, and are also cognizant of the risk that the economy could tilt into recession this year if, in fact, we are not already in a recession. We try to underwrite our loans so as to minimize losses, even in very bad markets. . . .

*. . . We do not anticipate any change in our strategy of pursuing a smaller number of larger loans. This maximizes our ability to include senior management in all material loan decisions*.

**ANSWER TO PARAGRAPH NO. 36:**

Defendants admit that on April 29, 2008, Corus issued a press release which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith. Defendants deny any remaining allegations in paragraph 36.

37.    In response to this announcement, the price of Corus stock declined from $9.62 per share to $7.33 per share, or 23.8%, on extremely heavy trading volume. Defendants, however, continued to conceal Corus' true financial and operating condition.

**ANSWER TO PARAGRAPH NO. 37:**

Defendants deny the allegations in paragraph 37.

38.    As discussed further in ¶56, *infra*, the statements discussed in ¶¶29-37 supra were each materially false and misleading when made, as known to defendants or recklessly disregarded by them, because they failed to disclose, among other problems, the rapid deterioration in Corus' loan portfolio and the Company's woefully insufficient loan loss reserves.

**ANSWER TO PARAGRAPH NO. 38:**

Defendants deny the allegations in paragraph 38.

39.     On May 8, 2008, defendants signed and filed with the SEC Corus' First Quarter 2008 Form 10-Q, in which defendants continued to make false and misleading statements and omit material information about the Company's condition.  Defendants stated in pertinent part:

2007 was a very difficult year for many banks and financial institutions in our country, as it was for Corus.  Unfortunately, 2008 appears to be shaping up to be at least as difficult.  The Company's earnings for the first three months of 2008 were only $4.5 million, which followed a similarly low level of earnings during the fourth quarter of 2007.  Severe disruption in the mortgage, housing and credit markets that developed during 2007, and continued into 2008, has led to significant increases in nonaccrual loans, charge-offs and loan loss provisions for Corus. . . .

While such low earnings are disappointing, *we remain confident in our business model and fully expect Corus to be able to absorb any losses that may occur.  We continue to have a strong capital position, strong liquidity and an excellent management team*.

\*       \*       \*

**Originations**.  In spite of the difficult market conditions, Corus successfully originated $821 million in new commercial real estate loans during the first three months of 2008.  This was not only substantially higher than the $321 million of originations during the first quarter of 2007, but in fact above the highest level of quarterly originations during 2007.  With the potential for a near-term recession and with a goal of not adding any new problem loans to our portfolio, *we are mindful to approach new business with a cautious, even pessimistic, view of the markets*.  We are pleased to report that over half of the 2008 first quarter originations were in the office sector.  *We are seeing new opportunities in the office, apartment, and hotel markets as a result of the upheaval in financial markets*.  We expect to see a considerable portion of our near-term originations in these three non-condominium sectors as well.  We are pleased to create diversification in our loan portfolio by property type.

**Summary**.  In summary, our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise.  *We are not contemplating any major changes in our business model.  We fully expect Corus to be able to absorb any losses that may occur, even assuming the housing crisis deepens further and extends to 2010 before there is meaningful recovery.  We continue to have a strong capital position, strong liquidity, and an excellent management team. We are confident that we can weather this storm*.

25

**ANSWER TO PARAGRAPH NO. 39:**

Defendants admit that Messrs. Glickman and Taylor signed, and on May 8, 2008 Corus filed with the SEC, Corus' First Quarter 2008 Form 10-Q.  The remainder of paragraph 39 refers to selected contents of Corus' First Quarter 2008 Form 10-Q, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants  deny any remaining allegations in paragraph 39.

40.    Corus' First Quarter 2008 Form 10-Q also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Glickman and Taylor:

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. . . .

\*        \*        \*

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**ANSWER TO PARAGRAPH NO. 40:**

Paragraph 40 refers to selected contents of Corus' First Quarter 2008 Form 10-Q, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 40.

41.    On May 19, 2008, Corus issued a press release announcing the results of its share repurchase efforts during the second quarter of 2008.  Defendant Glickman stated, in pertinent part:

"We believe that repurchases of our Company's stock at such a low level relative to book value will produce long-term value for our shareholders. ***The Board and***

*management though are quite mindful of the challenging market conditions, particularly the significant capital duress many financial firms are facing, and continue to focus on maintaining the Company's fortress-like balance sheet.* Maintaining a solid capital base has been one of our guiding principles for many years, and in fact the Company has built two layers of capital 'cushion' into the Company's balance sheet."

\*       \*       \*

"Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise. *We are not contemplating any major changes in our business model.* While the Board and management are keenly aware of significant challenges posed by the current credit markets, *we believe the Company's tremendous capital strength has positioned the Company to absorb any losses that may occur, even assuming the housing crisis deepens further and extends to 2010 before there is meaningful recovery. We continue to have a strong capital position, strong liquidity, and an excellent management team. I am confident that we can weather this storm.*"

**ANSWER TO PARAGRAPH NO. 41:**

Defendants admit that on May 19, 2008 Corus issued a press release, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith. Defendants deny any remaining allegations in paragraph 41.

42.    On July 28, 2008, Corus issued a press release announcing its financial results for the second quarter of 2008, the period ending June 30, 2008. For the quarter, the Company reported a net loss of $16.2 million, or $0.30 per share. Defendant Glickman commented on the results stating in pertinent part as follows:

While the current environment is quite unpleasant, *it is not at all unexpected. We have always recognized that a severe downturn in the residential real estate markets was a possible, if not likely, occurrence. We have always expressly provided for the possibility of such a downturn, and the associated nonaccrual loans and provisions for credit losses, in our corporate planning. In fact, this possibility is precisely the reason Corus has maintained such unusually strong capital and liquidity levels for so many years now.* While in years gone by some may have questioned the Company's need for such a fortress-like balance sheet, it is now clear that our advance building of capital and liquidity were the right moves.

\*       \*       \*

27

It is clear that residential property values in many parts of the U.S. have declined, and substantially so in certain markets. *With that said . . . even a substantial fall in the value of the collateral does not necessarily mean Corus is going to take a loss on a first mortgage loan*. This essentially gets to the reason that our reserve for loan losses is not 100% of the loan amount, even for our troubled loans. *In order to believe that Corus' loan loss reserve should be 100% of any problem loan means one would also have to believe that the collateral value is $0 – neither a likely nor logical conclusion. . . .*

So the point is that we carefully scrutinize the current collateral value backing each loan, and if the current collateral value is not equal to or greater than our loan exposure, then we would either charge-off the collateral deficiency amount or specifically reserve for this deficiency in our loan loss reserves. *We strongly believe that our loan loss reserves are adequate and are, while it may go without saying, estimated in accordance with all appropriate rules and regulations of GAAP and regulatory guidance*.

\* \* \*

While the current economic downturn, and the difficulties it presents for the Company, is unpleasant, it needs to be viewed in the context of the years leading up to now, when we had very high profits. Our business is cyclical, and needs to be understood and evaluated in that way. As expressed in the past, Corus continues to believe that the measure of any company's success must be made over an entire business cycle, and not by looking at just good or bad years in isolation from one another. Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise. *We are not contemplating any major changes in our business model*.

*We remain confident in our business model and fully expect Corus to be able to absorb any losses that may occur; even if the housing crisis deepens further and/or extends into 2009 or beyond before there is meaningful recovery. We continue to have a strong capital position, strong liquidity, and an excellent management team. We are confident that we can weather this storm*.

\* \* \*

**Originations**. In the first half of 2008, we originated $1.2 billion of new loans. *We expect originations to remain reasonably strong during the rest of the year, and hope to book a total of approximately $2 billion of new business for the entire year of 2008*, which is at the bottom end of the range we were considering at the end of last quarter. Given the growth in problem loans in our existing portfolio, *we are being very demanding on new credits, and looking for extremely large equity investments. We feel very good about the credit quality and profitability of this new business. . . .*

28

*We are approaching new business with a cautious, even pessimistic view of the markets*.  We anticipate that the housing market will continue to weaken throughout 2008, and possibly also through 2009, and we are also cognizant of the risk that the economy could tilt into recession if, in fact, we are not already there.  We try to underwrite out loans so as to minimize losses, even in very bad markets. . . .  *We do not anticipate any change in our strategy of pursuing a smaller number of larger loans.  This maximizes our ability to include senior management in all material loan decisions*.

**ANSWER TO PARAGRAPH NO. 42:**

Defendants admit that on July 28, 2008, Corus issued a press release, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 42.

43.    In the July 28, 2008 press release, defendants also announced that, despite deteriorating market conditions and Corus' declining stock price, the Company repurchased 1,307,400 shares of Corus common stock during the second quarter of 2008.  Defendants reassured investors that "the Board and management continue to be quite interested in additional share repurchases.  While the Board and management are mindful of the difficult current market conditions and monitor Corus' capital levels very closely, with Corus' stock trading at such low levels relative to book value, share repurchases could nonetheless be an excellent use of the Company's capital."

**ANSWER TO PARAGRAPH NO. 43:**

Defendants admit that by on or about June 30, 2008, Corus had repurchased 1,307,400 shares of Corus common stock during the second quarter of 2008 at an average price of $5.49 per share.  The remainder of paragraph 43 refers to selected contents of Corus' July 28, 2008 press release, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 43.

44.    On August 6, 2008, defendants signed and filed with the SEC Corus' Second Quarter 2008 Form 10-Q.  In the Form 10-Q, defendants repeated their positive reassurances as to the stability of the Company despite the deteriorating market conditions. Defendants stated as follows:

While the current environment is quite unpleasant, ***it is not at all unexpected.   We have always recognized that a severe downturn in the residential real estate markets was a possible, if not likely, occurrence.  We have always expressly provided for the possibility of such a downturn, and the associated nonaccrual loans and provisions for credit losses, in our corporate planning.  In fact, this possibility is precisely the reason Corus has maintained such unusually strong capital and liquidity levels for so many years now***.  While in years gone by some may have questioned the Company's need for such a fortress-like balance sheet, it is now clear that our advance building of capital and liquidity were the right moves.

*          *          *

So the point is that we carefully scrutinize the current collateral value backing each loan, and if the current collateral value is not equal to or greater than our loan exposure, then we would either charge-off the collateral deficiency amount or specifically reserve for this deficiency in our loan loss reserves.  ***We strongly believe that our loan loss reserves are adequate and are, while it may go with out saying, estimated in accordance with all appropriate rules and regulations of GAAP and regulatory guidance***.

*          *          *

In spite of the difficult market conditions, Corus successfully originated $1.2 billion of new loans during the first half of 2008.  Given the growth in problem loans in our existing portfolio, and with the potential for a near-term recession, we are mindful to approach new business with a cautious, even pessimistic, view of the markets.  ***We are therefore being very demanding on new credits, and looking for extremely large equity investments.  We feel very good about the credit quality and profitability of this new business. . . .***

*          *          *

While the current economic downturn, and the difficulties it presents for the Company, is unpleasant, it needs to be viewed in the context of the years leading up to now, when we had very high profits.  Our business is cyclical, and needs to be understood and evaluated in that way.  As expressed in the past, Corus continues to believe that the measure of any company's success must be made over an entire business cycle, and not by looking at just good or bad years in isolation from one another.  Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise.  ***We are not contemplating any major changes in our business model***.

***We remain confident in our business model and fully expect Corus to be able to absorb any losses that may occur; even if the housing crisis deepens further and/or extends into 2009 or beyond before there is meaningful recovery.***

30

*We continue to have a strong capital position, strong liquidity, and an excellent management team.  We are confident that we can weather this storm*.

\*        \*        \*

In the first half of 2008, we originated $1.2 billion of new loans.  *We expect originations to remain reasonably strong during the rest of the year, and hope to book a total of approximately $2 billion of new business for the entire year of 2008*, which is at the bottom end of the range we were considering at the end of last quarter.  Given the growth in problem loans in our existing portfolio, *we are being very demanding on new credits, and looking for extremely large equity investments.  We feel very good about the credit quality and profitability of this new business. . . .*

We are approaching new business with a cautious, even pessimistic view of the markets.  We anticipate that the housing market will continue to weaken throughout 2008, and possibly also through 2009, and we are also cognizant of the risk that the economy could tilt into recession if, in fact, we are not already there.  We try to underwrite our loans so as to minimize losses, even in very bad markets . . . .  *We do not anticipate any change in our strategy of pursuing a smaller number of larger loans.  This maximizes our ability to include senior management in all material loan decisions*.

*We are seeing new opportunities in the office, apartment, and hotel markets as a result of the upheaval in financial markets. . . .*

**ANSWER TO PARAGRAPH NO. 44:**

Defendants admit that Messrs. Glickman and Taylor signed, and on August 6, 2008 Corus filed with the SEC, Corus' Second Quarter 2008 Form 10-Q.  The remainder of paragraph 44 refers to selected contents of Corus' Second Quarter 2008 Form 10-Q, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 44.

45.    Corus' Second Quarter 2008 Form 10-Q also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendants Glickman and Taylor:

2.        Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

31

3.      Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report. . . .

\*       \*       \*

(3)      The information contained in the Report fairly presents, in all material
respects, the financial condition and results of operations of the Company.

**ANSWER TO PARAGRAPH NO. 45:**

Paragraph 45 refers to selected contents of Corus' Second Quarter 2008 Form 10-Q,

which speaks for itself and Defendants refer to the full content of that document and deny any

allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 45.

46.      In response to defendants' statements, the price of Corus stock rose from $3.99
per share to $4.50 per share, or 12.8%.  Defendants, however, continued to conceal the true
financial and operating condition of Corus.

**ANSWER TO PARAGRAPH NO. 46:**

Defendants deny the allegations in Paragraph 46.

47.      Analysts responded favorably to defendants' positive statements despite the
worsening credit environment.  For example, on October 3, 2008, Channel Trend reported that:
"Corus expects difficult credit conditions to persist through the remainder of 2008.  Particularly,
the lender's exposure to the condominium construction market will be a serious threat to its
performance in the coming quarters.  ***Nonetheless, the bank is confident that it can 'weather the
storm' even if the crisis persists through 2009 and beyond.  The lender believes it has strong
capital and liquidity positions to counter the current challenges***."

**ANSWER TO PARAGRAPH NO. 47:**

Defendants lack knowledge or information sufficient to form a belief about the truth of

the allegations in paragraph 47.

48.      On October 6, 2008, Corus unexpectedly announced the resignation of defendant
Taylor for "personal reasons."  When asked by a Chicago Tribune reporter whether Taylor's
departure less than a month before quarterly results were scheduled to be released could raise a
red flag for investors, defendant Glickman stated that "***people could assume something has gone***

32

*on that's bad, but I believe we'd be negligent in our disclosures if we knew something and didn't disclose it*."  Glickman further reassured the reporter that Corus' deposits were "fine" and that "[o]n the loan side it's a challenge, but every day we have some victories . . . .  We're paying a lot of attention to our loan portfolio and working this through."

**ANSWER TO PARAGRAPH NO. 48:**

Defendants admit that on or about October 6, 2008, Corus announced Mr. Taylor's resignation.  Defendants lack knowledge or information regarding the Chicago Tribune article sufficient to form a belief as to the truth of the allegations regarding that article and deny any remaining allegations in paragraph 48.

49.    Prior to this announcement, Corus' stock traded at $4.20 per share.  Within two days of the announcement, the stock closed at $2.92 per share.  However, the stock continued to be artificially inflated due to Glickman' s false assurances.

**ANSWER TO PARAGRAPH NO. 49:**

Defendants Corus and Glickman admit that on October 3, 2008 Corus stock closed at $4.20 per share and on October 8, 2008 it closed at $2.92 per share.  Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of paragraph 49.  Defendants deny any remaining allegations in Paragraph 49.

50.    Then, on October 29, 2008, shortly after stating on August 6, 2008 (over one month into the third quarter) that defendants "*expect[ed] originations to remain reasonably strong during the rest of the year*," defendants issued a press release announcing its third quarter financial results for the period ending September 20, 2008 and announcing for the first time that the Company "*did not originate any new loans in the third quarter of 2008" and did not intend to originate any new loans*.  Defendants, however, continued to conceal the true financial and operating condition of Corus.  Defendant Glickman commented on the results stating in pertinent part as follows:

"*We had always recognized that a severe downturn in the residential real estate markets was a possible, if not likely, occurrence and we positioned ourselves accordingly*.  While we had planned for the possibility of such a downturn, and the associated nonaccrual loans and provisions for credit losses, in our corporate planning, the current housing calamity is worse than even the "severe downturn"

for which we had planned.  ***Fortunately, in preparation for such an event, we built unusually strong capital and liquidity levels during the good years***."

\*       \*       \*

    "***Corus did not originate any new loans in the third quarter of 2008***. Given the uncertain condition of the commercial real estate market, and our desire to bolster our capital ratios, ***management has decided that this is not the right time to originate new loans***.  We hope that events will transpire over the coming quarters such that we will again feel comfortable originating loans."

\*       \*       \*

"While the current economic downturn, and the difficulties it presents for the Company, are unprecedented, ***the difficulties need to be viewed in the context of the years leading up to now, when we had very high profits***.  Our business is cyclical, and needs to be understood and evaluated in that way.  As expressed in the past, Corus continues to believe that the measure of any company's success must be made over an entire business cycle, and not by looking at just "good" or "bad" years in isolation from one another.  Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise."

**ANSWER TO PARAGRAPH NO. 50:**

The first sentence in Paragraph 50 selectively quotes from Corus' Second Quarter 2008 Form 10-Q, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of any remaining allegations in paragraph 50. Defendants Corus and Glickman admit that on October 29, 2008, Corus issued a press release. The remainder of paragraph 50 refers to selected contents of Corus' October 29, 2008 press release, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants Corus and Glickman deny that they concealed Corus' financial and operating condition and deny any remaining allegations in paragraph 50.

51.    In the October 29, 2008 press release, defendants also announced for the first time that Corus was in preliminary discussions with banking regulators regarding funds made available by the U.S. Treasury Department under its Troubled Asset Relief Program Capital Purchase Program ("TARP CPP").   Defendants stated, however, that "at this point it is not certain whether or not Corus would apply for participation," but that they were "continuing to review the matter."

**ANSWER TO PARAGRAPH NO. 51:**

Paragraph 51 refers to selected contents of Corus' October 29, 2008 press release, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith.   Defendants Corus and Glickman deny any remaining allegations in paragraph 51.   Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51.

52.    The day following its press release, on October 30, 2008, Corus again shocked the market by announcing the resignation of Stein, "to pursue other opportunities."   Stein was the second high level executive at Corus to resign that month.

**ANSWER TO PARAGRAPH NO. 52:**

Defendants Corus and Glickman admit that on or about October 30, 2008, Michael Stein resigned as Executive Vice-President of the Bank to pursue other opportunities.   Defendants Corus and Glickman admit that Messrs. Taylor and Stein both resigned in October 2008. Defendants Corus and Glickman deny any remaining allegations in paragraph 52.   Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52.

53.    Also on October 30, 2008, defendants signed and filed with the SEC Corus' Third Quarter 2008 Form 10-Q.   In the Form 10-Q, defendants continued to make false and misleading statements and omit material information about the strength of the Company:

Corus reported a net loss for the 2008 third quarter of $128.0 million, or $2.38 per diluted share . . . .   We are operating in an economic environment that is more challenging and volatile than any we have ever seen.   The primary source of the current market difficulties stems from one of the worst housing slumps this

country has experienced. . . .  The combination of these forces, coupled with Corus' focus on condominium construction lending, have led to significant increases in loan loss provisions, and, as a result, significant operating losses. Our stock price has also suffered tremendously as a result.  Unfortunately, we anticipate these difficulties will persist for some time.

*We had always recognized that a severe downturn in the residential real estate markets was a possible, if not likely, occurrence and we positioned ourselves accordingly*.  While we had planned for the possibility of such a downturn, and the associated nonaccrual loans and provisions for credit losses, in our corporate planning, the current housing calamity is worse than even the "severe downturn" for which we had planned.  *Fortunately, in preparation for such an event, we built unusually strong capital and liquidity levels during the good years*.

*        *        *

*Corus did not originate any new loans in the third quarter of 2008*. Given the uncertain condition of the commercial real estate market, and our desire to bolster our capital ratios, *management has decided that this is not the right time to originate new loans*.  We hope that events will transpire over the coming quarters such that we will again feel comfortable originating loans.

*        *        *

While the current economic downturn, and the difficulties it presents for the Company, are unprecedented, *the difficulties need to be viewed in the context of the years leading up to now, when we had very high profits*.  Our business is cyclical, and needs to be understood and evaluated in that way.  As expressed in the past, Corus continues to believe that the measure of any company's success must be made over an entire business cycle, and not by looking at just "good" or "bad" years in isolation from one another.  *Our main focus at this time is to manage our business safely during this tremendous downturn and to be poised to take advantage of any market opportunities which may arise*.

**ANSWER TO PARAGRAPH NO. 53:**

Defendants Corus and Glickman admit that Mr. Glickman and Michael Dulberg, Corus' Chief Financial Officer, signed, and on October 29, 2008 Corus filed with the SEC, Corus' Third Quarter 2008 Form 10-Q.  The remainder of paragraph 53 refers to selected contents of Corus' Third Quarter 2008 Form 10-Q, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith.

36

Defendants Corus and Glickman deny knowingly making false or misleading statements in Corus' Third Quarter Form 10-Q, or at any other time, and deny any remaining allegations in paragraph 53.  Defendant Taylor denies that he signed Corus' Third Quarter 2008 Form 10-Q and lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 53.

54.     Corus' Third Quarter 2008 Form 10-Q also included the following certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002 by defendant Glickman and new Corus CFO Michael E. Dulberg:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. . . .

*     *     *

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**ANSWER TO PARAGRAPH NO. 54:**

Paragraph 54 refers to selected contents of Corus' Third Quarter 2008 Form 10-Q, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants Corus and Glickman deny any remaining allegations in paragraph 54.  Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 54.

55.     On November 18, 2008, Corus issued a press release announcing that it had "submitted its application under the U.S. Treasury Department Troubled Asset Relief Program Capital Purchase Program on November 14, 2008.  The Company has not yet received a response relating to its application."

**ANSWER TO PARAGRAPH NO. 55:**

Paragraph 55 refers to selected contents of Corus' November 18, 2008 press release, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith. Defendants Corus and Glickman deny any remaining allegations in paragraph 55. Defendant Taylor lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55.

56.    The statements referenced above in ¶¶29-55 were each materially false and misleading when made because they failed to disclose the following material facts which were known to defendants or recklessly disregarded by them:

(a)    Corus' loan portfolio was rapidly deteriorating prior to and throughout the Class Period. According to a former Vice President and Senior Construction Manager at Corus ("CW1"), by mid-2006, Corus' construction loan portfolio was already showing signs of problems, and things continued going south quickly thereafter. The construction on condo projects entered into during the condo frenzy began falling behind schedule, and construction costs had unexpectedly become astronomically high. CW1 reported directly to Stein and the witness' high level responsibilities included reviewing background information on proposed condo projects and developers to guide underwriting decisions on whether to approve requested construction loans, monitoring construction projects after Corus made a loan commitment, and offering guidance on whether to approve ongoing "draws" on construction loan commitments based on developers' performance. Thus, CW1 was in a position to have such knowledge and is sufficiently reliable.

(b)    Other confidential witnesses corroborated these facts. According to a former Assistant Vice President of Loan Portfolio Administration at Corus ("CW2"), by 2008 developers were having a hard time securing supplemental financing to complete their projects, which was often necessary on large condo development projects due to the projects going over budget. Historically, developers went to the mezzanine lender on the project for supplemental project financing, who was usually willing to provide the additional financing to ensure that the project would be completed in order to protect their subordinate loan. When the United States credit markets began to freeze up in 2007 and 2008, however, mezzanine lenders were no longer willing or able to extend that supplemental financing. As a result, Corus' developer borrowers were unable to complete their projects.

(c)    Additionally, according to CW2, the majority of Corus' construction loans were made between 2004 and 2006, during the housing frenzy, and took three to four years to complete construction. By the time these projects neared completion in 2007 and 2008, the housing market had dropped significantly due to a decline in demand and a glut in supply. As a result, the value of Corus-funded condos, which served as the only collateral for Corus' loans, dropped significantly. CW2 began working for Corus in April 2005 and held the position of Assistant Vice President of Loan Portfolio Administration from December 2007 until July 2008. CW2 was responsible for supervising Portfolio Administration employees who compiled all

condo purchase contracts at the condo projects for which Corus provided constructions loan. Thus, CW2 was in a position to have such knowledge and is sufficiently reliable.

(d) By January 2008, an astonishing $3.96 billion of Corus' loans – about 90% of the Company's loans outstanding – were due for maturity or re-pricing by early to mid-2008. More than $2 billion of these loans were in South Florida alone. This meant that thousands of condo units planned during the robust housing years were due to enter a glutted market amid buyer cancellations, declining property values and a gridlocked mortgage market. Even worse, the condo projects were not generating the expected sales and, as Corus noted in its 2007 Form 10-K, "an increasing number of borrowers [were] requesting extension and other amendments to their loans." According to CW2, by 2008, mortgage loans had become increasingly difficult to obtain. As a result, an increasing number of buyers who signed "presale" purchase agreements before construction even began, and put down deposits of 3% to 30% of the condo purchase price, simply walked away from their purchase commitments, leaving many completed condos unsold. The proceeds that were to come from these condo sales were the source from which Corus' loans were to be repaid. Moreover, as construction projects neared completion, interest reserves, the provisions that gave developers funds to pay interest until the projects were complete, were depleted. Once the projects were completed and failed to sell, the loans would go into default. Because the construction loans were still technically performing, however, the full stress of these distressed loans on Corus was hidden from investors.

(e) Even if technically still performing, many of Corus' loans were fast approaching failure and/or potential foreclosure. As a result, and unbeknownst to investors, Corus began creating numerous SPEs, or Corus-affiliated entities, for the purpose of acquiring and/or controlling properties in the event of foreclosure on their associated loans. Corus created and/or contracted at least 26 SPEs and affiliated entities to handle distressed loans during the Class Period, each listing Corus' headquarters as its principal address and/or listing Corus employees as their executives. Such entities included: Laguna Bay Marketing Corp.; Allegro Palm Marketing LLC; Colonnade Artech Owner LLC; Tao Sawgrass GP, LLC; W/K Sawgrass LLP; Tradewinds Marketing LLC; 565 Peachtree Marketing Corp.; 8255 Las Vegas Marketing Corp.; Allegro Palm Condominium Association; Aria Marketing Corp.; Balboa Ridge Marketing Corp.; Biltmore Heights Marketing Corp.; Brookhaven Marketing Corp.; Central Villas Marketing Corp.; CGI Marketing Corp.; Glencoe Marketing Corp.; Hawthorne Marketing Corp.; Horizon Condominium Association, Inc.; Laketown Warf Resort Community Association, Inc.; LWMC, Inc.; Marina Lofts Marketing Corp.; Montage Marketing Corp.; Mosiac North Marketing Corp.; Tao Sawgrass Condominium Association; The Hawthorne Condominium Association; and Tradewinds, a Metrowest Condominium Association. With few exceptions, these affiliated entities and the distressed loans associated with them were not disclosed to investors.

(f) In an attempt to conceal Corus' dire financial condition and falsely stimulate the condo market, defendants began manufacturing sham condo sales. To perpetrate their fraud, Corus and/or its affiliates began purchasing condos in Corus-funded developments in an attempt to create the illusion of successful sales. On November 24, 2008, Colonnade Artech Owner ("Colonnade"), which is managed by four of Corus' executives and uses Corus' headquarters as its principal address, bought four units, including three of the most expensive units, in the Artech Residences at Aventura, a condo project for which Corus had provided a $130 million loan. Colonnade is managed by Laguna Bay Marketing Corporation ("Laguna"),

which also uses Corus' headquarters as its principal address and lists Tina Dendrinos, a loan officer for Corus, as its managing member.  Prior to Colonnade's purchases, only 12 of the 235 units in the development had been sold.

        (g)     Defendants attempted to use these sham purchases to inflate the appraised values of the condos in order to delay Corus having to recognize losses on financing for such condos.  Indeed, as reported by the *South Florida Business Journal*, "[s]ales history is one of the most important factors in appraisals," and "[g]etting appraisals to match presale values has been a major challenge for many South Florida condo developers.  If the appraisals come in too low, the buyer would qualify for less financing."   Additionally, defendants wanted to inflate developers' sales figures to increase the likelihood of successful future sales and inflate appraisal values for the condos to ensure inflated future prices.  To ensure inflated values, Colonnade paid significantly above market value for the units.  For instance, it paid $481 per square foot for one unit, when a similar unit was listed for sale at an asking price of only $388 per square foot.  Defendants could then use the illusion of a current successful sales history as evidence to potential buyers that units were selling at that inflated price.  Defendants' fraudulent tactics, and the underlying sales problems they were meant to conceal, were hidden from investors during the Class Period.

        (h)     According to Corus' 2007 Annual Report, it was "very important for the Bank's earnings that we continue to originate new loans."  Defendants' knew, however, that as a result of the market conditions, Corus was unable to originate profitable loans necessary to "weather the storm."  Consequently, Corus announced on January 25, 2008 that it was amending its commission scheme.  Historically, Corus maintained a Commission Program for Commercial Loan Officers (the "CLO Program").  Pursuant to the CLO Program, a portion of an officer's commission was withheld by the Company for a substantial period of time ("holdbacks").  The holdbacks were then at risk of loss in the event the Company suffered a loss on a loan originated by the officer.  In 2007, however, and contemporaneous with the housing market decline, the Company modified its CLO Program so that loans originated on or after November 1, 2006 would no longer be subject to a holdback provision (the "New CLO Program"), thereby allowing loan officers to keep their full commission on new loans originated even if those loans resulted in a loss and, thus, encouraging loan quantity over quality.   This scheme to pump up loan originations allowed defendants to maintain the false perception that Corus was continuing to originate healthy loans throughout 2007 and 2008 despite the deteriorating market conditions.  As a result, defendants announced on April 29, 2008, and again on May 8, 2008, that "[i]n spite of the difficult market conditions, Corus successfully originated $821 million in new commercial real estate loans during the first three months of 2008.  This was not only substantially *higher* than the $321 million of originations during the first quarter of 2007, *but in fact above the highest level of quarterly originations during 2007*."  In reality, however, Corus was making risky, low-quality loans for which its officers were being rewarded, further deteriorating its loan portfolio.  Notably, defendants cancelled the New CLO Program and reverted back to the holdback CLO Program on October 20, 2008 (effective November 1, 2008), but only after announcing that they were no longer originating loans.

        (i)     Contrary to defendants' Class Period reassurances of Corus' "*tremendous capital strength*" and "*strong capital position*," Corus' capital condition was also quickly deteriorating.  As a result, Corus was involved in detailed and ongoing discussions with the FRB and OCC during the Class Period, ultimately resulting in strict limitations being placed on Corus' operations.  According to defendant Glickman's post-Class Period admissions, he and

other senior management were involved in ongoing discussions with the OCC and the FRB for several months during the Class Period to address the negative impact that the current market conditions were having on Corus' capital position. Investors, however, were unaware of these discussions.

**ANSWER TO PARAGRAPH NO. 56:**

Defendants deny the allegations in Paragraph 56.

## CORUS' FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

**Background**

57.    As detailed herein, Corus' publicly issued financial statements and related earnings releases during the Class Period were materially misstated in violation of GAAP because defendants failed to record adequate and timely loan loss reserves and misled investors as to the significant loss exposure Corus faced related to the Company's portfolio of loans.

**ANSWER TO PARAGRAPH NO. 57:**

Defendants deny the allegations in paragraph 57.

58.    The two central accounting items related to defendants' fraudulent manipulation of Corus' loan loss reserves during the Class Period were the reserve or Allowance for Loan Losses ("ALL") on the balance sheet (which reduces assets), and the corresponding Provision for Credit Losses, which is a direct reduction of pre-tax earnings on Corus' income statement. The accounting for these items is governed by specific GAAP provisions and SEC rules. Because there is a plethora of guidance on the subject, defendants were well informed of how to account for the ALL and provision for credit losses during the Class Period. These accounting items were the most important estimates Corus made in its financial statements. The rules that defendants violated are set forth below.

**ANSWER TO PARAGRAPH NO. 58:**

Defendants admit that accounting for the Allowance for Loan Losses and the Provision

for Credit Losses is governed by GAAP provisions and SEC rules, and that Corus reported these

items in accordance with GAAP and the applicable SEC rules on its financial statements.

Defendants deny that they violated any rules in accounting for the Bank's allowance for loan

losses and provision for credit losses and deny any remaining allegations in paragraph 58.

41

59.     SEC Staff Accounting Bulletin No. 102, Selected Loan Loss Allowance Methodology and Documentation Issues ("SAB 102") states, "For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements."  Corus was no exception, and as a result of its failure to record adequate and timely loan loss reserves, Corus' financial statements during the Class Period were in violation of GAAP.  Corus' reported net loans, pre-tax income and EPS were materially overstated and its provision for credit losses was understated at each quarter during the Class Period as shown in the chart below:

| ($ in millions – except per share data) | FY 2007 | 1Q 2008 | 2Q 2008 | 3Q 2008 | FY 2008 |
|---|---|---|---|---|---|
| Loans, net | $4,338.4 | $4,469.5 | $4,500.7 | $4,167.9 | $3,783.3 |
| Provision for Credit Losses | $66.0 | $36.8 | $58.5 | $182.2 | $637.5 |
| Net Income (Loss) | $106.2 | $4.5 | $(16.2) | $(128.0) | $(456.5) |
| EPS – Diluted | $1.85 | $0.08 | $(0.30) | $(2.38) | $(8.41) |

**ANSWER TO PARAGRAPH NO. 59:**

The first sentence of Paragraph 59 refers to selected contents of SEC Staff Accounting Bulletin No. 102, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  The chart included in Paragraph 59 refers to selected information from some of Corus' financial statements and Defendants refer to the full content of those documents and deny any allegations inconsistent therewith.  Defendant Taylor lacks knowledge or information about Corus' fiscal year 2008 figures sufficient to form a belief as to the accuracy of those values in the above chart.  Defendants deny any remaining allegations in paragraph 59.

**Applicable Accounting Rules**

60.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public

companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  Regulation S-X, 17 C.F.R. §210.10-01(a), requires that interim financial statements, such as quarterly financial statements, must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements.

**ANSWER TO PARAGRAPH NO. 60:**

Defendants admit that the SEC has statutory authority relating to the promulgation of GAAP for public companies and has delegated such authority to the Financial Accounting Standards Board.  Sentences 3 and 4 refer to selected contents of SEC Regulations S-X, 17 C.F.R. §210.4 and 210.10, which speak for themselves and Defendants refer to the full content of those statutes and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 60.

61.    Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ("SFAS 5"), SEC Staff Accounting Bulletin No. 102, *Selected Loan Loss Allowance Methodology and Documentation Issues* ("SAB 102"), Statement of Financial Accounting Standards No. 114, *Accounting by Creditors for Impairment of a Loan* ("SFAS 114"), EITF Topic No. D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* ("EITF Topic D-80"), FASB Interpretation No. 14 *Reasonable Estimation of the Amount of a Loss* ("FIN 14"), SEC Financial Reporting Release No. 28 ("FRR 28"), and Statement of Financial Accounting Standards No. 65, *Accounting for Certain Mortgage Banking Activities* ("FAS 65") set forth the standards of financial accounting and reporting for loan loss reserves.

**ANSWER TO PARAGRAPH NO. 61:**

Defendants refer to the full content of the documents referenced in Paragraph 61 and deny any allegations inconsistent therewith.  Defendants deny any remaining allegation in paragraph 61.

62.    Additionally, the AICPA issues industry-specific Audit & Accounting Guides to provide guidance in preparing financial statements in accordance with GAAP.  The Audit and Accounting Guide for Depository and Lending Institutions ("AICPA Audit and Accounting

43

Guide") was applicable to Corus. The AICPA also issues Audit Risk Alerts particularized by industry which address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements.

**ANSWER TO PARAGRAPH NO. 62:**

Defendants admit that AICPA Audit & Accounting Guide and Audit Risk Alerts provide guidance in preparing financial statements in accordance with GAAP and that the Bank's primary businesses were commercial real estate lending and deposit gathering. To the extent that Paragraph 62 refers to selected contents of any AICPA Audit & Accounting Guide, Defendants refer to the full content of such document and deny any allegations inconsistent therewith. Defendants deny any remaining allegations in paragraph 62.

63.     Corus was also required under GAAP to prepare its financial statements in accordance with the following fundamental accounting principles:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users of the financial reports in making rational investment, credit, and similar decisions. (FASB Statement of Concepts No. 1, ¶34);

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (FASB Statement of Concepts No. 1, ¶40);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period because investors and creditors often use information about the past to help in assessing the prospects of an enterprise. (FASB Statement of Concepts No. 1, ¶42);

- The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. (FASB Statement of Concepts No. 1, ¶50);

- The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASB Statement of Concepts No. 2, ¶¶58-59);

- The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions.  (FASB Statement of Concepts No. 2, ¶79);

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  (FASB Statement of Concepts No. 2, ¶95);

- The principle that revenues and gains should not be recognized until they are both earned and realizable.  (FASB Statement of Concepts No. 5, ¶83); and

- The principle that if collectability of assets received for products, services, or other assets is doubtful, revenues may be recognized on the basis of the cash received.  (FASB Statement of Concepts No. 5, ¶84).

**ANSWER TO PARAGRAPH NO. 63:**

Defendants admit that Corus was required to present its financial statements in accordance with GAAP.  To the extent that Paragraph 63 refers to selected contents of FASB Statement of Concepts Nos. 1, 2 and 5, those documents speak for themselves and Defendants refer to the full content of those documents and deny any allegations inconsistent therewith. Defendants deny any remaining allegations in paragraph 63.

### DEFENDANTS CONCEALED IMPAIRMENTS AND LOSSES IN CORUS' LOAN PORTFOLIO IN VIOLATION OF GAAP

**Summary**

64.    Corus' condo loans were rapidly deteriorating prior to and throughout the Class Period, yet defendants failed to recognize the losses in accordance with GAAP.  Additionally, as alleged in greater detail herein, during the Class Period, defendants caused Corus to engage in the origination of inherently risky, low-quality loans for which its officers were being rewarded under the "New CLO Program" which was unveiled in 1Q08.  Such lending was a key to Corus' overall growth in early 2008 (*i.e.*, originations for 1Q08 of $821 million were 156% higher than originations for 1Q07).

**ANSWER TO PARAGRAPH NO. 64:**

Defendants deny the allegations in paragraph 64.

65.    While the general risks of the loans associated with the deteriorating housing market was recognized by investors, defendants assured investors that Corus' projects were

"*more desirable*" than other housing units and that the Company had a "*fortress-like balance sheet*" and was in a strong capital position and strong liquidity position.  During 2008, however, defendants sacrificed quality for quantity of loans originated by originating riskier loans. Moreover, throughout the Class Period, default rates began to rise sharply at Corus, going from only one foreclosure in 2007 to eight by September 30, 2008 and 18 by December 31, 2008. Defendants, nevertheless, repeatedly continued to tout Corus' strong financial statements, while failing to record adequate and timely loan loss reserves on Corus' portfolio of loans.  Instead, defendants hid the mounting losses and risks associated with Corus' lending business from investors.  As the market worsened, defendants were forced to disclose that those assets had been overvalued and under-reserved.  Ultimately, at the end of the Class Period, Corus had to increase the ALL by four-fold, from 1.61% of loans as of December 31, 2007, to 6.641% as of December 31, 2008, and 8.14% as of March 31, 2009.  The provision for credit losses increased to $637.5 million in 2008, almost ten times as much as was recorded in 2007.  This essentially wiped out all the earnings Corus had reported for the previous five years.  In accordance with GAAP and reflecting the already known risks and impairments to the loan portfolio, a substantial portion of these losses, however, should have been taken in the form of loan loss reserves beginning no later than December 2007.  Had defendants complied with GAAP and properly accounted for the true value of the loan portfolio, the reported losses would have wiped out all of Corus' earnings and given investors a true picture of the Company's dire financial health.

**ANSWER TO PARAGRAPH NO. 65:**

Defendants admit that the Bank reported one foreclosure in 2007 and as of September 30, 2008 the Bank was in the process of foreclosing on eight non-accrual loans.  Defendants Corus and Glickman admit that as of December 31, 2008 the Bank was in the process of taking possession of eighteen properties; Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of this allegation.  Defendant Corus further admits that the Bank increased the allowance for loan losses from approximately 1.61% of loans as of December 31, 2007, to approximately 6.65% as of December 31, 2008, and approximately 8.14% as of March 31, 2009, and increased the provision for credit losses to approximately $637.5 million in 2008. Defendant Taylor admits the December 31, 2007 loan loss reserve percentage, but lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in sentences 7 and 8.  Defendant Glickman admits the December 31, 2007 and December 31, 2008 loan loss reserve percentages and the 2008 provision for credit losses, but lacks knowledge

or information sufficient to form a belief as to the truth of the allegations in the remainder of

sentence 7.   Defendants deny that they failed to comply with GAAP or failed adequately to

calculate the Bank's loan loss reserves, and deny any remaining allegations in paragraph 65.

**Corus' High Risk Loan Portfolio Was Susceptible to Losses and Defendants Ignored Red Flags**

66.     Defendants were required, under GAAP, to take into account various portfolio attributes (*e.g.*, Corus' high concentration of condo construction loans, Corus' increases in charge-offs and foreclosures, etc.) in evaluating the possible impairment of Corus' loan portfolio and in the calculation of appropriate loan loss reserves at the end of each quarter.   Defendants were also required to, under GAAP – and explicitly stated in their SEC filings that they did – assess various economic and industry trends when calculating the ALL.   These trends, or red flags in this case, were ignored by defendants.   The red flags include, but are not limited to, the following, all of which should have strongly indicated to defendants that the visibility and value of Corus' portfolio was impaired:

- From December 2006 to December 2007 to December 2008, charge-offs associated with Corus' portfolio increased exponentially from $2.6 million to $40.6 million to $410.1 million, respectively.

- From June 2007 through August 2007, condo sales in Las Vegas and Miami alone fell 46% and 29%, respectively, from the same three-month period the prior year, and speculation was growing that the once frothy condo market was past its peak.

- During the Class Period, Corus' construction loans originated during the housing frenzy were approaching maturity.   An astonishing $3.96 billion of Corus' loans – about 90% of the Company's loans outstanding – were due for maturity or re-pricing by early to mid-2008.   More than $2 billion of these condo loans were in South Florida alone.   This meant that thousands of condo units planned during the robust housing years were due to enter a glutted market amid buyer cancellations, declining property values and a gridlocked mortgage market.

- As of December 31, 2007, Corus' noncurrent condo loans nearly quadrupled from a year earlier to $282.8 million.

- The number of foreclosures Corus was initiating was increasing rapidly, from only one foreclosure during 2007 (and Corus stated in the 2007 10-K that they anticipated commencing foreclosure procedures on three loans in early 2008) to eight loans by 3Q08 and eighteen loans by year end 2008.

- Corus' condo projects were not generating the expected sales.

- The value of the collateral on the loans was decreasing as the housing market was swiftly deteriorating, thus increasing the risk of credit loss for Corus.

**ANSWER TO PARAGRAPH NO. 66:**

Defendants admit that Corus was required under GAAP to take into account various portfolio attributes when evaluating the possible impairment of the Bank's loan portfolio and in calculating the appropriate allowance for loan losses and deny that Corus failed to comply with the applicable GAAP provisions.  Defendants admit that the Bank's charge-offs increased from approximately $2.6 million in 2006 to approximately $40.6 million in 2007.  Defendants further admit that the Bank reported one foreclosure in 2007 and as of September 30, 2008 the Bank was in the process of foreclosing on eight non-accrual loans.  Defendants Corus and Glickman admit that as of December 31, 2008 the Bank was in the process of taking possession of eighteen properties; Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of this allegation.  Defendants admit that the Bank's nonaccrual condominium loans totaled approximately $72.472 million on December 31, 2006 and totaled approximately $282.152 million on December 31, 2007.  Defendants deny any remaining allegations in paragraph 66.

**Defendants Failed to Account for Declining Collateral Values**

67.     In calculating Corus' loan loss reserves, defendants were also required to consider the declining value of the collateral backing its loans.  In assessing loans for impairment, Corus management should have identified loans for which it was probable that the Company would be unable to collect all amounts due according to the contractual terms of the loan agreements.  It was then incumbent on management to evaluate the fair value of the underlying collateral to arrive at estimated impairment losses.  As domestic property values collapsed, delinquencies and subsequent foreclosures in Corus' lending portfolio were more likely to, and did, result in significant losses. SAB 102 states:

> A registrant's loan loss allowance methodology generally should . . . [c]onsider current collateral values (less costs to sell).

EITF Topic No. D-80 states:

- In assessing whether loans are fully collateralized and thus whether there is a need for an allowance on those loans, institutions should consider the reliability and timing of appraisals or other valuations to ensure that the values used for any allowance calculations are realistically and reliably measured.  An institution

should ***ensure that an appraisal of collateral reflects a realistic estimate of fair value***, which takes into consideration the time it will take the institution to realize the value of the collateral and ***current market conditions for selling the collateral***.

**ANSWER TO PARAGRAPH NO. 67:**

The first four sentences of Paragraph 67 purport to summarize the contents of SAB 102 and EITF Topic D-80 and sentences 5-7 purport to selectively quote portions of those documents.  SAB 102 and EITF Topic D-80 speak for themselves and Defendants refer to the full content of those documents and deny any allegations inconsistent therewith.  Defendants deny that the Bank failed to properly assess its loan impairment or to properly calculate its loan loss reserves, and deny any remaining allegations in paragraph 67.

68.    Given that the value of the underlying assets of Corus' loans was dropping rapidly – so much so that defendants engaged in purchasing units at inflated prices in an attempt to increase comparable appraisals – market conditions required that defendants adjust Corus' ALL to reflect the default risks.  Defendants, however, failed to timely adjust Corus' allowance or reassess the value of the Company's collateral assets.

**ANSWER TO PARAGRAPH NO. 68:**

Defendants deny the allegations in paragraph 68.

## DEFENDANTS VIOLATED GAAP

**GAAP Provisions Violated by Defendants in Accounting for Loan Loss Reserves**

69.    During a November 2000 speech to the AICPA National Conference on Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated the following:

In plain English, the allowance for loan losses must reflect, on a timely basis, the changes in the credit quality of an institution's loan portfolio.  ***As credit quality deteriorates, the allowance should be adjusted upward in a timely fashion to reflect the additional losses that have been incurred***.

**ANSWER TO PARAGRAPH NO. 69:**

Defendants lack knowledge or information sufficient to form a belief about the truth of

the allegations in paragraph 69.

70.     During the Class Period, Corus' ALL failed to cover the likely and estimable losses associated with the Company's $4+ billion portfolio of risky loans.

**ANSWER TO PARAGRAPH NO. 70:**

Defendants deny the allegations in paragraph 70.


71.     Section 9.19 of the Audit and Accounting Guide for Depository and Lending Institutions provides that financial institutions are responsible for "***maintain[ing] adequate controls to ensure the ALL is consistently determined in accordance with GAAP, stated policies and procedures, and relevant supervisory guidance***."

**ANSWER TO PARAGRAPH NO. 71:**

Paragraph 71 refers to selected contents of Section 9.19 of the Audit and Accounting

Guide for Depository and Lending Institutions, which speaks for itself and Defendants refer to

the full content of that document and deny any allegations inconsistent therewith.  Defendants

deny any remaining allegations in paragraph 71.


72.     Section 9.04 of the same Accounting Guide for Depository and Lending Institutions also provides: "***Management is responsible*** for estimating credit losses . . . . [m]anagement must make careful judgments about collectibility and estimates of losses. ***Management's judgments should consider micro- and macro-economic factors; past, current, and anticipated events based on facts in evidence at the balance-sheet date***; and realistic courses of action it expects to take."

**ANSWER TO PARAGRAPH NO. 72:**

Paragraph 72 refers to selected contents of the Audit and Accounting Guide for

Depository and Lending Institutions, which speaks for itself and Defendants refer to the full

content of that document and deny any allegations inconsistent therewith.  Defendants deny any

remaining allegations in paragraph 72.

73.     Under GAAP, a loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to possible loss.  *See* SFAS 5, ¶1.  The collectibility of loans is an example of a loss contingency. GAAP requires that an estimated loss from a loss contingency be accrued by a charge to income if both of the following conditions are met: (a) *information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (b) the amount of loss can be reasonably estimated*.  *See* SFAS 5, ¶8.

**ANSWER TO PARAGRAPH NO. 73:**

Paragraph 73 refers to selected contents of SFAS 5, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 73.

74.     Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "*reasonable possibility*" that a loss or an additional loss may have been incurred.[3]  SFAS 5, ¶10. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  *See* SFAS 5, ¶10.

**ANSWER TO PARAGRAPH NO. 74:**

Paragraph 74 refers to selected contents of SFAS 5, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 74.

75.     Corus represented that it complied with GAAP, specifically SFAS 114.  In its 2007 Form 10-K, Corus stated:

> In accordance with Statement of Financial Accounting Standards No. 114, "Accounting by Creditors for Impairment of a Loan," as amended ("SFAS 114"), more than remote but less than likely."  SFAS 5, ¶3.  Corus classifies loans as impaired if, based on current information and events, it is probable that the Company will be unable to collect all amounts due according to the contractual terms of the loan agreement.  As a practical matter, impaired loans are the sum of nonaccrual loans and any loans classified as troubled debt restructurings ("TDR"). A loan is classified as a TDR when management grants, for economic or legal

---

[3]      GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is *more than remote but less than likely*."  SFAS 5, ¶3.

reasons related to the borrower's financial condition, concessions to the borrower that management would not otherwise consider.  A TDR may result from situations where the borrower is experiencing financial problems and expects to have difficulty complying with the original terms of the loan.

**ANSWER TO PARAGRAPH NO. 75:**

Paragraph 75 refers to selected contents of Corus' 2007 Form 10-K, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 75.

76.      SFAS 114, ¶13 states:

When a loan is impaired as defined in paragraph 8 of this Statement, a creditor shall measure impairment based on the present value of expected future cash flows discounted at the loan's effective interest rate, except that as a practical expedient, a creditor may measure impairment based on a loan's observable market price, or the fair value of the collateral if the loan is collateral dependent. Regardless of the measurement method, a creditor shall measure impairment based on the fair value of the collateral when the creditor determines that foreclosure is probable.  A loan is collateral dependent if the repayment of the loan is expected to be provided solely by underlying collateral. . . .  If the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), *a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense . . . .*

**ANSWER TO PARAGRAPH NO. 76:**

Paragraph 76 refers to selected contents of SFAS 114, ¶13, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 76.

77.      SFAS 114, ¶8 and EITF Topic D-80A clearly describe that an evaluation of loan impairment must be made in context of current information and events, stating in part:

A loan is *impaired* when, *based on current information and events*, it is *probable* that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. . . .  *[A]ll amounts due according to the contractual terms* means that both the contractual interest payments and the

contractual principal payments of a loan will be collected as scheduled in the loan agreement. . . .

> *Existing "environmental" factors (for example, existing industry, geographical, economic, and political factors) should be considered as part of current information and events when assessing a loan* that has been identified for evaluation under Statement 114.  (Emphasis added and in original.)

In a hypothetical example included in EITF Topic D-80, the EITF described how current environmental factors, such as the "red flags" described herein, impact the evaluation of loan impairment in light of historical loss statistics. EITF Topic D-80 states in part:

> The bank would consider the effect of the current economic downturn to assess whether a loss has been incurred in that group of loans at the balance sheet date and to estimate the amount of loss.  In doing so, the bank would consider its historical loss experience in collecting loans in similar situations, such as the typical recovery rate, including amount and timing.  *However, the use of historical statistics alone would be inappropriate if the nature of the loans or current environmental conditions differ from those on which the statistics were based*.

**ANSWER TO PARAGRAPH NO. 77:**

Paragraph 77 refers to selected contents of SFAS 114 ¶8 and EITF Topic D-80, which speak for themselves and Defendants refer to the full content of those documents and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 77.

78.    The Audit and Accounting Guide for Depository and Lending Institutions §9.37 further provides that a loan loss should be taken immediately upon origination if, as in Corus' case, loan credit procedures are inadequate or overly aggressive: "Generally, a loan would be impaired at origination only if a faulty credit granting decision has been made or loan credit review *procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of loan origination*."

**ANSWER TO PARAGRAPH NO. 78:**

Paragraph 78 refers to selected contents of The Audit and Accounting Guide for Depository and Lending Institutions §9.37, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 78.

**SEC Rules Violated by Defendants in Accounting for Loan Loss Reserves**

79.    The SEC provides explicit guidance on the proper accounting for loan losses that defendants were required to follow, but did not. SAB 102 states in pertinent part:

> It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process.*** . . .   A registrant's loan loss allowance methodology generally should . . . *[c]onsider all known relevant internal and external factors that may affect loan collectibility; . . .[c]onsider the particular risks inherent in different kinds of lending; [c]onsider current collateral values (less costs to sell) . . . [and] [b]e based on current and reliable data.*

**ANSWER TO PARAGRAPH NO. 79:**

Paragraph 79 refers to selected contents of SAB 102, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of paragraph 79.

80.    SAB 102 also provides:

> Factors that should be considered in developing loss measurements include . . . *[l]evels of and trends in delinquencies and impaired loans; [l]evels of and trends of charge-offs and recoveries; . . . [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices;  . . .[n]ational and local economic trends and conditions; [and] [i]ndustry conditions.*

**ANSWER TO PARAGRAPH NO. 80:**

Paragraph 80 refers to selected contents of SAB 102, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 80.

81.    The SEC further states:

> For many entities engaged in lending activities, ***the allowance and provision for loan losses are significant elements of the financial statements***. Therefore, the staff believes it is appropriate for an entity's management to

*review, on a periodic basis, its methodology for determining its allowance for loan losses.*

## ANSWER TO PARAGRAPH NO. 81:

Paragraph 81 appears to refer to selected contents of SAB 102, which speaks for itself and Defendants refer to the full content of that document and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations in paragraph 81.

82.     Corus failed to adequately record the ALL in order to overstate its earnings prior to and during the Class Period in violation of GAAP and SEC rules.  Defendants knew the ALL was understated, in part due to their practices with respect to purchasing condo units at above market prices to distort the "comps," or comparable units sold, for appraisal purposes.  Moreover, charge- offs had increased dramatically prior to the Class Period from $2.64 million in 2006, to $40.63 million in 2007.  This was clearly an omen of problems to come.

## ANSWER TO PARAGRAPH NO. 82:

Defendants admit that charge-offs increased from approximately $2.6 million in 2006, to approximately $40.6 million in 2007.  Defendants deny that Corus failed to adequately record the allowance for loan losses in violation of GAAP or that defendants knew that the allowance for loan loss was understated, and deny any remaining allegations in paragraph 82.

## THE TRUTH BEGINS TO BE REVEALED

83.     On January 30, 2009, an article appeared in the South Florida Business Journal entitled "Affiliate of Corus buys units in condo project financed by bank."  The article disclosed that Corus was using affiliated entities to purchase condos in Corus-funded projects.  The article stated, in part:

Banking analysts are wondering why the Chicagoans paid $5.5 million for four units.

Not only did Fortune International get a $130 million loan from Corus Bank to build its Artech Residences at Aventura, but it can also thank its directors for a fourth of its unit closings and 42 percent of its sales to date.

Colonnade Artech Owner, which is managed by four of the Chicago bank's executives, bought four units in the condo for a combined $5.5 million on Nov. 24, according to state and county court records.  Miami-based Fortune has

sold a total of 16 units for $13.3 million in the 235-unit Artech since it started closings in September.

Fortune officials did not return several calls seeking comment, and neither did the executives at Miami-based Shefaor Development, a partner on the project. Corus Senior VP Brian Broduer, who signed a document releasing the four units from the Corus construction mortgage, declined comment.

Corus had $1.38 billion in condo loans outstanding in South Florida as of Sept. 30.

Last year, Corus said it repossessed the Tao condominium in Sunrise by gaining control of its developer, rather than through a foreclosure. The entity that controls Tao is managed by Laguna Bay Marketing Corp., which shares the same Chicago address as Corus and has four of the bank's officials listed as directors.

Colonnade Artech Owners, which was incorporated on Nov. 10 has the same address, too, and lists Laguna Bay Marketing Corp. as its manager in state records.

A Corus executive did not respond to a query about whether Colonnade Artech is a subsidiary of the bank or its holding company, Corus Bankshares (NASDAQ: CORS).

"Why would a bank, which is not in the real estate business, want to own real estate? That doesn't make any sense," said Joaquin Urquiola, a partner with the Coral Gables-based accounting firm Goldstein Schechter Koch and a board member of Pacific National Bank in Miami. "I've heard stories where banks will do that to show that loans are performing, but that would require a more material number of units."

Urquiola said selling to Colonnade Artech might have helped the developer meet sales goals in one of its contracts, he said.

"Perplexed" by prices paid.

Condo Vultures Realty CEO Peter Zalewski said he's "perplexed" by the high prices Colonnade Artech paid for those units. It spent $481 a square foot for penthouse unit 512. A similar Artech unit listed for sale online had an asking price of $388 a square foot.

The three most expensive units bought at Artech were sold to Colonnade Artech. Those were also the first three units sold on the building's penthouse level.

"There are some real challenges associated with that building," Zalewski said. "The pricing makes it almost dysfunctional for the neighborhood."

56

Zalewski said Artech's surroundings are more like a working-class area.

He doesn't understand why an apparent Corus affiliate would buy those units unless it helped the developer meet a sales target it needed for a bulk sale or a refinancing.

Urquiola has another theory. Getting appraisals to match presale values has been a major challenge for many South Florida condo developers. If the appraisals come in too low, the buyer would qualify for less financing. Sales history is one of the most important factors in appraisals.

"Maybe, by showing units being sold at that price, there are current sales that can be shown as evidence to potential buyers that units are selling at that price," Urquiola said.

Saying he's never seen a bank do something like this, Jack McCabe, CEO of Deerfield Beach-based McCabe Research and Consulting, said that influencing appraisals could have been a motive.

"It doesn't make sense why they would go in and pay what would be considered a premium retail price at this point for any other reason," he said. "It would seem a logical reason that they are trying to yield appraisal support for as high a value as possible for future closings."

**ANSWER TO PARAGRAPH NO. 83:**

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 83.

84.    That same day, January 30, 2009, Corus released partial financial results for fiscal 2008 and announced for the first time that it had been ***engaged in discussions with bank regulators and "may no longer be considered well-capitalized*.**"  The Company reported a preliminary net loss of $260.7 million, or $4.85 per share, for the fourth quarter of 2008 and a net loss of $400.4 million, or $7.38 per share, for the 2008 fiscal year.  The press release stated in pertinent part:

The preliminary results do not include potential entries that could arise from subsequent adjustments relating to our commercial real estate loan portfolio. While we have completed internal assessments on the bulk of our portfolio, we have ordered, but not yet received, several appraisals. ***The appraisals are used as a basis for determining the value of the underlying collateral of our loans and significant variations between our internal assessments and the appraisals could have a material impact on our financial results*.**

\*       \*       \*

57

Corus is suffering from the extraordinary effects of what may ultimately be the worst economic downturn since the Great Depression. The effects of the current environment are being felt across many industries with financial services and residential real estate being particularly hard hit. The effects of the downturn have been particularly acute during the last 90-180 days of 2008. Corus, with a portfolio consisting primarily of condominium construction loans, many in the hard hit areas of Arizona, Nevada, south Florida and southern California, *has seen a rapid and precipitous decline in the value of the collateral securing our loan portfolio*.

\* \* \*

*Based on recent discussions with the Bank's regulators*, management believes it is likely that the Bank will be held to higher capital standards in the near future and, as such, *may no longer be considered well-capitalized* and may be required to identify additional sources of capital.

\* \* \*

In an attempt to address the issues many banks are facing, the U.S. Treasury Department has made funds available to certain banks under its Troubled Asset Relief Program Capital Purchase Program (the "Program"). As previously disclosed, the Company submitted its application for funds under the Program on November 14, 2008. *The Company has received a preliminary response from the Treasury Department indicating that they intend to reject our application*, but the final action has not been taken and Corus continues to pursue the TARP application and other capital raising options.

**ANSWER TO PARAGRAPH NO. 84:**

Paragraph 84 refers to selected contents of Corus' January 30, 2009 press release, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document, deny any allegations inconsistent therewith, and deny any remaining allegations in paragraph 84. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.

85.    The market reacted very negatively to defendants' belated disclosures. Indeed, as a result of these disclosures, analyst America's Watchdog reported on February 2, 2009 that "*[t]he company is in dire straits," and "appears unlikely to survive 2009*." The market price of Corus common stock dropped nearly 47% to close at $0.59 per share on February 2, 2009, on heavy trading volume in excess of two million shares.

**ANSWER TO PARAGRAPH NO. 85:**

Defendants admit that Corus stock closed at $1.11 on January 30, 2009 and at $0.59 per share on February 2, 2009. Defendants lack knowledge or information of the February 2, 2009 America's Watchdog report sufficient to form a belief as to the truth of the allegations in sentence 2. Defendants deny any remaining allegations in paragraph 85.

86. On February 18, 2009, Corus issued a press release expanding on its discussions with regulators and announcing that it had entered into consent agreements with the Federal Reserve Bank of Chicago and the Office of the Comptroller of the Currency. The press release stated, in part:

> Corus Bankshares, Inc. today announced that, in coordination with, and at the request of, both the Federal Reserve Bank of Chicago (the "FRB") and the Office of the Comptroller of the Currency (the "OCC"), the Company and its subsidiary bank, Corus Bank, N.A. (the "Bank"), respectively, have entered into a Written Agreement (the "Agreement") with the FRB and a Consent Order (the "Order") with the OCC.

> The Agreement and the Order (collectively, the "Regulatory Agreements") contain a list of strict requirements ranging from a capital directive, which requires Corus and the Bank to achieve and maintain minimum regulatory capital levels (in the Bank's case, in excess of the statutory minimums to be classified as well-capitalized) to developing a liquidity risk management and contingency funding plan, in connection with which the Bank will be subject to limitations on the maximum interest rates the Bank can pay on deposit accounts. The Regulatory Agreements also include several requirements related to loan administration as well as procedures for managing the Bank's growing portfolio of foreclosed real estate assets. Corus is also restricted from paying any dividends or making any capital distributions, including distributions related to its trust preferred debt without advance regulatory approval. The Bank has agreed to form a board compliance committee, which will be charged with monitoring and coordinating its adherence to the provisions of the Regulatory Agreements. Corus and the Bank will be required to provide regular progress reports to both the board of directors and the regulators.

> "***The Regulatory Agreements are the result of ongoing discussions between the OCC, the FRB and Corus' senior management over the last few months to address the negative impact that current market conditions are having on Corus and how best to resolve them***. We believe the remedial measures agreed upon with the regulators are necessary to address asset quality deterioration and overall risk management," said Robert J. Glickman, President and Chief Executive Officer.

59

"I want to emphasize to our customers that all of our deposit accounts are insured by the Federal Deposit Insurance Corporation to the maximum amount permitted by law. Furthermore, the board of directors is actively exploring Corus' strategic alternatives, including a merger or capital infusion."

While the Company intends to take such actions as may be necessary to enable Corus and the Bank to comply with the requirements of the Regulatory Agreements, there can be no assurance that Corus or the Bank will be able to comply fully with the provisions of the Regulatory Agreements, or that compliance with the Regulatory Agreements, particularly the limitations on interest rates offered by the Bank, will not have material and adverse effects on the operations and financial condition of the Company and the Bank. Any material failure to comply with the provisions of the Regulatory Agreements could result in further enforcement actions by both the FRB and the OCC.

**ANSWER TO PARAGRAPH NO. 86:**

Defendants Corus and Glickman admit that on February 18, 2009, Corus issued a press release, which speaks for itself and Defendants Corus and Glickman refer to the full content of that document and deny any allegations inconsistent therewith. Defendants Corus and Glickman deny any remaining allegations in paragraph 86. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86.

87. The market for Corus common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Corus securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Corus common stock relying upon the integrity of the market price of Corus common stock and market information relating to Corus, and have been damaged thereby.

**ANSWER TO PARAGRAPH NO. 87:**

Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 87. Defendants deny the remaining allegations in paragraph 87.

88. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Corus common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as

set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company and its business and operations, as alleged herein.

**ANSWER TO PARAGRAPH NO. 88:**

      Defendants deny the allegations in paragraph 88.


      89.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Corus' business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Corus and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**ANSWER TO PARAGRAPH NO. 89:**

      Defendants deny the allegations in paragraph 89.


## ADDITIONAL SCIENTER ALLEGATIONS

      90.     As alleged herein, defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Corus, their control over, and/or receipt and/or modification of Corus' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Corus, participated in the fraudulent scheme alleged herein.

**ANSWER TO PARAGRAPH NO. 90:**

      Defendants deny the allegations in paragraph 90.


      91.     Defendants knew throughout the Class Period, that Corus' loan portfolio was rapidly deteriorating and that numerous loans, even if technically still performing, were fast approaching failure and/or potential foreclosure.  Indeed, Corus specifically created numerous

undisclosed SPEs and affiliated entities for the purpose of handling these numerous distressed loans in the event of default. Moreover, defendant Glickman was, by his own admission, "***deeply involved in every major aspect of the lending process*** . . . includ[ing] structuring and pricing the loans, visiting the sites and inspecting comparable properties, meeting directly with the borrowers, underwriting and approving the loans, consulting on documentation issues, and making various decisions in the course of servicing the loans."

**ANSWER TO PARAGRAPH NO. 91:**

Defendants Corus and Glickman admit that during the Class Period Corus created a number of wholly-owned subsidiaries to hold and/or control distressed property acquired either through foreclosure or deed in lieu of foreclosure. Defendant Taylor lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence. The last sentence purports to be a partial quotation from an unidentified statement by Robert Glickman and on that basis Defendants lack information sufficient to form a belief as to the truth of the allegation. Defendants deny any remaining allegations in paragraph 91.

92.   Defendants also knew that they were not properly evaluating collateral values and recording adequate and timely loan loss reserves during the Class Period and, as a result, Corus' publicly issued financial statements and related earnings releases were materially misstated in violation of GAAP. Defendants' accounting for these items is governed by specific GAAP provisions and SEC rules. There is a plethora of guidance on the subject, and defendants were well informed of how to account for Corus' ALL and provision for credit losses during the Class Period. Indeed, these accounting items were the most important estimates Corus made in its financial statements.

**ANSWER TO PARAGRAPH NO. 92:**

Defendants admit that GAAP and SEC rules govern the accounting for collateral values and the establishment of loan loss reserves and that Corus reported these items in accordance with GAAP and the applicable SEC rules on its financial statements. Defendants deny any remaining allegations in paragraph 92.

93.   Additionally, despite their statements to the contrary, defendants knew that Corus was unable to maintain the level of profitable loan originations necessary to "weather the storm." Defendants' intentional manipulation of the Company's commission program to reward loan

officers for risky, low-quality loans in order to pump up loan originations confirms this knowledge.  Moreover, by their own admission, defendants knew that Corus' capital position was not strong enough to absorb its systemic losses.  Indeed, defendant Glickman later admitted that he and other Corus senior management were involved in "ongoing discussions" with regulators during the Class Period to address Corus' capital problems.

**ANSWER TO PARAGRAPH NO. 93:**

Defendants Corus and Glickman deny the allegations in paragraph 93.  Defendant Taylor

lacks knowledge or information sufficient to form a belief as to the truth of the regarding the last

sentence of paragraph 93 and denies the remaining allegations in paragraph 93.

94.    Furthermore, defendants' involvement in condo purchases to artificially inflate the value of Corus' collateral and falsely stimulate the condo market establishes their knowledge that condo sales were well-below expectations and that the value of Corus' collateral was rapidly declining.  Likewise, defendants' active involvement in the scheme itself establishes knowledge of such fraudulent practices.

**ANSWER TO PARAGRAPH NO. 94:**

Defendants deny the allegations contained in paragraph 94.

**LOSS CAUSATION/ECONOMIC LOSS**

95.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Corus common stock and operated as a fraud or deceit on Class Period purchasers of Corus common stock by failing to disclose the material adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Corus common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Corus common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ANSWER TO PARAGRAPH NO. 95:**

Defendants deny the allegations contained in paragraph 95.

96.    By failing to disclose the material facts detailed herein and misrepresenting Corus' financial position, defendants presented a misleading picture of the Company's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Corus' business was not as healthy as represented, defendants falsely concealed the extent of Corus' exposure to the falling real estate market.  Defendants hid the fact that Corus' entire business was threatened

by its investments in the faltering condo market and its failure to properly account for its loan losses and loan loss reserves.

**ANSWER TO PARAGRAPH NO. 96:**

Defendants deny the allegations in paragraph 96.

97.    Defendants' claims of profitability and confidence in the market caused and maintained the artificial inflation in Corus' stock price throughout the Class Period and until the truth about its true financial condition was revealed to the market.  Defendants' false and misleading statements had their intended effect and caused Corus common stock to trade at artificially inflated levels throughout the Class Period.

**ANSWER TO PARAGRAPH NO. 97:**

Defendants deny the allegations contained in paragraph 97.

98.    As a direct result of these disclosures, the price of Corus common stock fell precipitously.  These disclosures removed the inflation from the price of Corus common stock, causing real economic loss to investors who had purchased Corus common stock during the Class Period.

**ANSWER TO PARAGRAPH NO. 98:**

Defendants deny the allegations contained in paragraph 98.

99.    The precipitous decline in the price of Corus common stock after these disclosures was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Corus common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the Class was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Corus common stock and the subsequent significant decline in the value of Corus common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**ANSWER TO PARAGRAPH NO. 99:**

Defendants deny the allegations in paragraph 99.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

100.   At all relevant times, the market for Corus common stock was an efficient market for the following reasons, among others:

(a)   Corus common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   as a regulated issuer, Corus filed periodic public reports with the SEC and the NASDAQ;

(c)   Corus regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Corus was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## ANSWER TO PARAGRAPH NO. 100:

Defendants admit that Corus: 1) common stock met the requirements for listing and was listed and traded on the NASDAQ; 2) filed periodic public reports with the SEC and the NASDAQ; 3) communicated with investors through regular press releases and other public disclosures; and 4) was followed by various financial analysts.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in subparagraph d.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation that the market for Corus' stock was at all relevant times an efficient market and deny any remaining  allegations in Paragraph 100.

101.   As a result of the foregoing, the market for Corus common stock promptly digested current information regarding Corus from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Corus common stock during the Class Period suffered similar injury through their purchase of Corus common stock at artificially inflated prices and a presumption of reliance applies.

**ANSWER TO PARAGRAPH NO. 101:**

Defendants lack knowledge or information sufficient to form a belief about the allegations in the first sentence of Paragraph 101. Defendants deny any remaining allegations in paragraph 101.

## NO SAFE HARBOR

102.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Corus who knew that those statements were false when made.

**ANSWER TO PARAGRAPH NO. 102:**

Plaintiffs' allegations states legal conclusions to which no answer is required. To the extent an answer may be required, Defendants deny the allegations in paragraph 102.

## CLASS ACTION ALLEGATIONS

103.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired the common stock of Corus between January 25, 2008 and January 30, 2009. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which defendants have or had a controlling interest.

**ANSWER TO PARAGRAPH NO. 103:**

Paragraph 103 states legal conclusions to which no answer is required. To the extent an answer may be required, Defendants admit that Plaintiffs purports to bring a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a putative class

consisting of all persons who purchased or otherwise acquired the common stock of Corus

between January 25, 2008 and January 30, 2009.  Defendants deny any remaining allegations of

fact  in paragraph 103.

104.    The members of the Class are so numerous and geographically disperse across the
country so that joinder of all members is impracticable.  While the exact number of Class
members is unknown to plaintiff at this time and can only be ascertained through appropriate
discovery, there are over 37 million shares of Corus common stock outstanding, and plaintiff
believes that there are hundreds, if not thousands, of Class members.  Members of the Class may
be identified from records maintained by Corus or its transfer agent and may be notified of the
pendency of this action by mail.  Plaintiff's claims are typical of the claims of the other members
of the Class in that all members of the Class have been damaged by the acts of defendants, which
caused members of the Class to purchase Corus common stock at artificially inflated prices.

**ANSWER TO PARAGRAPH NO. 104:**

Paragraph 104 states legal conclusions to which no answer is required.  Defendants admit

that, as of April 28, 2009 there were 53,711,680 shares of Corus Bankshares Common Stock

issued and outstanding.  Defendants lack knowledge or information sufficient to form a belief

about the allegations concerning what "plaintiff believes."  Defendants deny any remaining

allegations of fact set forth in paragraph 104.

105.    Plaintiff will fairly and adequately protect the interests of the other members of
the Class.  To assist him in that endeavor, plaintiff has retained counsel competent and
experienced in class and securities litigation.  Plaintiff is not aware of any interest which is
antagonistic to the interests of the Class.

**ANSWER TO PARAGRAPH NO. 105**:

Paragraph 105 states legal conclusions to which no answer is required.  Defendants deny

any allegation of fact set forth in paragraph 105.

106.    Common questions of law and fact exist as to all members of the Class and
predominate over any questions solely affecting individual members of the Class. Among the
questions of law and fact common to the Class are:
            (a)    whether the Exchange Act was violated by defendants' acts, as alleged
herein;

(b)   whether any materially false or misleading statements were made and/or defendants omitted material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER TO PARAGRAPH NO. 106:**

Paragraph 106 states legal conclusions to which no answer is required.  Defendants deny

any allegation of fact set forth in paragraph 106.

107.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to pursue individual redress for the damages caused to them by defendants' acts.  Plaintiff is not aware of any difficulty that will be presented in managing this action as a class action.

**ANSWER TO PARAGRAPH NO. 107:**

Paragraph 107 states legal conclusions to which no answer is required.  Defendants deny

any allegation of fact set forth in paragraph 107.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

108.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**ANSWER TO PARAGRAPH NO. 108:**

Defendants Corus and Glickman incorporate their answers and objections to paragraphs

1-108 of the Complaint.  No response is required from Defendant Taylor because this count has

been dismissed as to him.

109.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER TO PARAGRAPH NO. 109:**

      Defendants Corus and Glickman deny the allegations in paragraph 109.    No response is

required from Defendant Taylor because this count has been dismissed as to him.


      110.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:
          (a)    Employed devices, schemes, and artifices to defraud;
          (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
          (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Corus common stock during the Class Period.

**ANSWER TO PARAGRAPH NO. 110:**

      Defendants Corus and Glickman deny the allegations in paragraph 110.  No response is

required from Defendant Taylor because this count has been dismissed as to him.


      111.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Corus common stock.  Plaintiff and the Class would not have purchased Corus common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**ANSWER TO PARAGRAPH NO. 111:**

      Defendants Corus and Glickman deny the allegations in paragraph 111.    No response is

required from Defendant Taylor because this count has been dismissed as to him.


      112.    As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Corus common stock during the Class Period.

**ANSWER TO PARAGRAPH NO. 112:**

Defendants Corus and Glickman deny the allegations in paragraph 112. No response is required from Defendant Taylor because this count has been dismissed as to him.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Glickman and Taylor

113. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

**ANSWER TO PARAGRAPH NO. 113:**

Defendants incorporate their answers and objections to paragraphs 1-113 of the Complaint.

114. Defendant Glickman acted as a controlling person of Corus within the meaning of §20(a) of the Exchange Act. By reason of his position as CEO of Corus, he had the power and authority to cause Corus to engage in the wrongful conduct complained of herein. By reason of such conduct, Glickman is liable pursuant to §20(a) of the Exchange Act.

**ANSWER TO PARAGRAPH NO. 114:**

Defendants deny the allegations in paragraph 114.

115. Defendant Taylor acted as a controlling person of Corus within the meaning of §20(a) of the Exchange Act. By reason of his position as CFO of Corus, he had the power and authority to cause Corus to engage in the wrongful conduct complained of herein. By reason of such conduct, Taylor is liable pursuant to §20(a) of the Exchange Act.

**ANSWER TO PARAGRAPH NO. 115:**

Defendants deny the allegations in Paragraph 115.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Defendants assert the following affirmative and additional defenses. The defenses and affirmative defenses

below incorporate Defendants' answers stated above, and each defense incorporates the allegations in the others.

1.     The Complaint fails to state a claim against Defendants upon which relief can be granted.

2.     Defendants did not knowingly or recklessly make any materially false or misleading statement.

3.     Plaintiff has failed to plead fraud against Defendants with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure.

4.     Plaintiff's claims are barred, in whole or in part, because of the lack of transaction and/or loss causation.

5.     Defendants Glickman and Taylor are not liable under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) for any of the allegedly fraudulent misstatements or omissions of Corus or its other directors, officers, employees, or agents because each acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged violations.

6.     The alleged misstatements and omissions were not material because other information available to Plaintiffs and other shareholders rendered those alleged misstatements and omissions not misleading.

7.     Every statement, act or omission by Defendants Glickman and Taylor was made or taken in good faith reliance on the statements and representations of others.

8.     Plaintiff's claims in Count Two are barred, in whole or in part, because Plaintiff cannot establish the primary liability necessary to assert a control person liability claim.

9.     Plaintiff's claims are barred, in whole or in part, based on the express notices in Corus' public statements regarding material facts and risks concerning Corus' securities.

10.     Plaintiff's claims are barred, in whole or in part, because Plaintiff had actual or constructive knowledge of the  matters claimed to be the subject of the alleged misstatements or omissions set forth in the Complaint at the time Plaintiff purchased Corus shares and thus assumed the risk of any damages proximately caused thereby.

11.     Plaintiff's claims are barred, in whole or in part, because Plaintiff knew, or in the exercise of reasonable care should have known, of the matters claimed to be the subject of the alleged misrepresentations and omissions set forth in the Complaint and was thus negligent with respect to the purchase of her Corus shares.  This negligence was the cause in fact and proximate cause of the alleged damages asserted in the Complaint.

12.     Plaintiff's claims are barred, in whole or in part, because the matters alleged in the Complaint to be non-public, and/or the subject of misrepresentations and omissions, were publicly disclosed and/or in the public domain, and as such, were available to Plaintiff and were at all times reflected in the price of Corus' common stock.

13.     Plaintiff's claims are barred, in whole or in part, because Plaintiffs did not reasonably rely on any of the statements or omissions alleged in the Complaint in deciding to purchase Corus shares.

14.     Plaintiff's claims are barred, in whole or in part, because Plaintiffs did not reasonably rely on any statement or omission for which any Defendant is responsible.

15.     Plaintiff's claims are barred, in whole or in part, because Plaintiff did not rely on the market in making his purchases or sales of Corus shares.

16.     Plaintiff's claims are barred, in whole or in part, because Plaintiff knew, or in the exercise of reasonable care should have known, the risks of investing in the stock market and thus assumed the risk of a decline in the value of his shares.

17.     Plaintiff's claims are barred, in whole or in part, because any alleged injuries and damages sustained or incurred by Plaintiff were caused in whole or in part by the acts or omissions of Plaintiff or others for whose conduct Defendants are not responsible.

18.     Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to reasonably act to mitigate their damages based on the decline of the value of his Corus shares.

19.     The allegedly false or misleading statements described in the Complaint were "forward-looking statements" accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, and are therefore excluded as a basis of liability pursuant to the safe harbor provisions of the Exchange Act, 15 U.S.C. § 78u-5(c)(1)(A)(i).

20.     The allegedly false or misleading statements described in the Amended Class Action Complaint were "forward-looking statements" that were "immaterial" and are therefore excluded as a basis of liability pursuant to the safe harbor provisions of the Exchange Act, 15 U.S.C. § 78u-5(c)(1)(A)(ii).

21.     Some or all of the allegedly false or misleading statements described in the Amended Class Action Complaint were "forward-looking statements" and Plaintiff has not and cannot prove such statements were made  by any Defendant with actual knowledge that the statement was false or misleading at the time it was made, or that the statement was made with the approval of an executive officer of Corus who had actual knowledge that the statement was false or misleading when made as required by the safe harbor provisions of the Exchange Act, 15 U.S.C. § 78u-5(c)(1)(B) (i) and (ii)..

22.     With respect to the allegedly false or misleading statements described in the Complaint, the investing public had been provided with sufficiently specific risk disclosures and other cautionary statements concerning the subject matter of the statements at issue to nullify any

potentially misleading effect of those statements and the statements are therefore not actionable pursuant to the bespeaks caution doctrine.

23.     Defendants are not liable to Plaintiff because any alleged decline in Corus' share price was caused by factors, such as market factors, other than the misstatements and omissions alleged in the Complaint.

24.     Defendants give notice of their intention to rely upon additional affirmative defenses that may become available or apparent during the course of discovery, and thus reserve their right to amend this answer accordingly.

**PRAYERS FOR RELIEF**

WHEREFORE, Defendants Corus, Glickman, and Taylor pray this Court:

A.      Dismiss the Complaint with prejudice;

B.      Deny Plaintiff any relief from Defendants whatsoever;

C.      Enter judgment in favor of Defendants; and

D.      Grant Defendants their costs and such other and further relief as this Court may deem just and equitable under the circumstances.

Dated: May 6, 2010                          Respectfully submitted,

                                            CORUS BANKSHARES, INC., ROBERT
                                            J. GLICKMAN, and TIM H. TAYLOR


                                            By ___/s/ Michael J. Gill_____
                                                   One of their attorneys

Michele L. Odorizzi
Michael J. Gill
John J. Tharp
David D. Pope
Mayer Brown  LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 6, 2010 he caused copies of Defendants' **ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT** to be served by ECF to each attorney having an email address on file with the Court.

May 6, 2010                                    _____/s/ Michael J. Gill_____
                                                                Michael J. Gill